**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SAUDI LOGISTICS AND TECHNICAL SUPPORT,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CASE NO. 1:08-CV-00142-NBF** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

# MEMORANDUM OF LAW IN SUPPORT OF SAUDI LOGISTICS AND TECHNICAL SUPPORT'S MOTION TO DISMISS FOR LACK OF JURISDICTION

**ATTORNEYS OF RECORD:**

**Roderic G. Steakley**
**Matthew B. Reeves**
**SIROTE & PERMUTT, P.C.**
305 Church Street Suite 800
P.O. Box 18248
Huntsville, Alabama 35804-8248
Telephone: (256) 536-1711
Facsimile: (256) 518-3681
Email: rsteakley@sirote.com
mreeves@sirote.com

**OF COUNSEL:**
**Jerome S. Gabig, Jr.**
515 Sparkman Drive
Huntsville, Alabama 35816
Telephone: (256) 509-0279
Facsimile: (256) 704-6002
Email: gabig3@comcast.net

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

STATEMENT OF ISSUES ........................................................................ 1

STATEMENT OF FACTS ......................................................................... 1

ARGUMENT ............................................................................................ 10

I. The Contracting Officer's Letter of March 14, 2007 Failed To Comply With The Requirements For A Final Decision. .................................................... 10

A. The FAR, As An Implementing Regulation Of The CDA's "State The Reasons For The Decision Reached," Required The Contracting Officer To Identify "Factual Areas Of Agreement And Disagreement" and To Provide Supporting Rationale For Her Decision. .......................................................................... 11

B. The FAR Required The Contracting Officer To Prepare A Memorandum Documenting Her Decision And To Provide A Copy Of The Memorandum To SALTS. .................................................... 13

II. The Contracting Officer's Letter Of March 14, 2007 Is An Invalid Final Decision Thus Depriving This Court Of Jurisdiction. .................................. 15

CONCLUSION ........................................................................................ 19

APPENDIX . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

1. Contracting Officer letter, March 14, 2007
2. SALTS letter, Aug. 6, 2003
3. SALTS letter, Aug. 25, 2003 (Borchardt Decl.)
4. SALTS letter, June 2, 2007
5. DCAA e-mail June 27, 2007
6. SALTS e-mail July 13, 2007
7. Contracting Officer letter, July 17, 2007

# TABLE OF AUTHORITIES

## FEDERAL CASES

Applied Cos. v. United States, 144 F.3d 1470 (Fed. Cir. 1998) .................................... 18

Daewoo Engineering & Construction Co. v. United States,
73 Fed. Cl. 547 (2006) .......................................................................... 19, 20

Dyncorp Info. Sys., LLC v. United States, 58 Fed. Cl. 446 (2003) ................................ 11

Johnson Controls World Services, Inc. v. United States,
43 Fed. Ct. 589 (1999) .......................................................................... 17, 18

Joseph Morton Co. v. United States, 757 F.2d 1273 (Fed. Cir. 1985) ............................ 18

Lavezzo v. United States, 74 Fed. Cl. 502 (2006) ........................................................ 12

New York Shipbuilding Corp. v. United States,
180 Ct. Cl. 446, 385 F.2d 427 (1967) ............................................................... 13

Newport News Shipbuilding & Dry Dock Co. v. Garrett,
6 F.3d 1547 (Fed. Cir. 1993) .......................................................................... 11

OTI America, Inc. v. United States, 68 Fed. Cl. 646 (2005) .......................................... 15

Pacific Architects & Eng'rs, Inc. v. United States,
203 Ct. Dl. 499, 491 F.2d 734 (1974) ............................................................... 13

Paul v. United States,
371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963) ................................................ 15

Reflectone, Inc. v. Dalton, 60 F.3d 1572 (Fed. Cir. 1995) ............................................ 18

Scanwell Laboratories, Inc. v. Shaffer,
424 F.2d 859 (C.A.D.C. 1970) ......................................................................... 15

Sharman Co. v. United States, 2 F.3d 1564 (Fed. Cir. 1993) .......................................... 18

SMS Data Products, Inc. v. United States, 19 Cl. Ct. 612 (1990) .................................. 16

## STATUTES

41 U.S.C. § 601 ........................................................................................ 14

41 U.S.C. § 605(a) .......................................................................... 10, 11, 18, 19

41 U.S.C. § 605(b) ........................................................................................ 9

41 U.S.C. § 607(e) ........................................................................................ 15

**OTHER AUTHORITIES**

Imperator Carpet & Interiors, Inc., GSBCA No. 6156, 81-2 BCA ¶15,248 .......... 18

**REGULATIONS**

FAR § 1.000-53.000 .......... 10

FAR § 1.301(b) (2002) .......... 11

FAR § 4.801 .......... 14

FAR § 15.407-1 .......... 13, 14

FAR § 33.207(c)(2) .......... 11

FAR § 33.211(a)(4) .......... 12, 14

FAR § 52.233-1(d)(1) .......... 12

## INTRODUCTION

Saudi Logistics and Technical Support ("SALTS") has filed its motion to dismiss for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims. SALTS hereby submits its memorandum with supporting appendices. SALTS respectfully submits that this case is due to be dismissed for lack of subject matter jurisdiction because the Contracting Officer failed to issue a valid final decision in compliance with governing statutory and regulatory provisions.

## STATEMENT OF ISSUES

1. Does the Contracting Officer's letter of March 14, 2007 fail to comply with the requirements for a final decision?
2. Was the Contracting Officer's letter of March 14, 2007 an invalid final decision, thus depriving this Court of subject matter jurisdiction?

## STATEMENT OF FACTS

This is an alleged defective pricing case. It arises out of a contract awarded to SALTS by the U.S. Army Aviation and Missile Command ("AMCOM") relating to the purchase of generators, spares, repair parts and ancillary generators, spares, repair parts and other items for generator sets procured under Foreign Military Sales Case SR-B-JBV to support Patriot Missile Systems being acquired on behalf of the Kingdom of Saudi Arabia. (Doc. nos. 1 and 10 at ¶ 4-7) On or about September 14, 1999, AMCOM executed Delivery Order ("DO") 0004 to Contract DAAH01-96-G-0001 pursuant to which SALTS agreed to provide the referenced generators and related components and services at a not-to-exceed price to the Royal Saudi Air Defense Forces, with the final

contract price remaining to be negotiated and definitized. (Doc. nos. 1 and 10 at ¶ 29) SALTS immediately began performance in September, 1999 at the request of the government. (Doc. nos. 1 and 10 at ¶ 30) The Contract was ultimately adjusted downward from the not-to-exceed price to a final firm, fixed price, executed March 29, 2000. The contract price was payable by AMCOM to SALTS in U.S. Dollars. A subcontract between SALTS and a German company (which was fully disclosed to the Government) by which SALTS acquired generators delivered under the contract was payable in either U.S. Dollars or Deutsche Marks ("DM") at a set ratio of $1 US = 1.5 DM. The German company was paid in conformance with the disclosed subcontract. The present dispute arises over the exchange rate incurred by SALTS between U.S. Dollars and DM.

The Defense Contract Auditing Agency ("DCAA") conducted a post-award audit, the findings of which were completed by March, 2002. (Doc nos. 1 and 10 at ¶ 43) On March 14, 2007, the Contracting Officer issued what she characterized as her "final" decision to SALTS declaring that "[t]he post award audit revealed that due to defective pricing, payments were made to you through contract completion" and made the following demand:

> Pursuant to the terms and conditions outlined in the contract, and in accordance with FAR 32.610, the Government hereby makes a demand for payment of excess profits of $7,379,180 and interest due through March 31, 2007 in the amount of $3,126,896, for a total amount due of $10,506,076. Interest charges will accrue, at the approximate rate of $1,536.56 per day, until paid.

(App. 1). No explanation of any kind was provided. No findings of fact were made, no reasons or rationale were presented. (See id.)

This action found its origins in DCAA Audit Report No. 2191-2001S42000002 (the "Audit Report") that issued on or about September 19, 2002. (Doc. nos. 1 and 10 at ¶ 44). The Audit Report states, in pertinent part, as follows:

> SALTS did not provide the most current cost or pricing data in regards to the actual exchange rate data it was incurring in purchasing the foreign currency to pay Lechmotoren (subcontractor), even though this was significantly different from the exchange rate that the proposed subcontract costs were based on. We recommend a subcontract cost adjustment of $5,054,953.

The Audit Report also recommends a price adjustment of $2,324,229 resulting from applying overhead, general and administrative ("G&A") expense, and profit rates to the allegedly overstated amount.

In a letter dated April 14, 2003, the Contracting Officer, based on the Audit Report, indicated that SALTS furnished cost or pricing data that was not accurate, complete, and current. The Contracting Officer requested SALTS to conduct an evaluation and provide findings and resolutions of the issues. (Doc nos. 1 and 10 at ¶ 45). In response to this inquiry, by letter dated August 6, 2003 to the Contracting Officer, SALTS explained why the Audit Report was mistaken regarding its preliminary conclusion that defective pricing had occurred. (Doc. no. 10 at ¶ 6; See a true and correct copy of the August 6, 2003 letter attached at App. 2). SALTS' letter set forth seven reasons why there was no defective pricing. (Id.) The following are the headers for each of the seven arguments made in SALTS' letter of August 6, 2003.

I. The DCAA Is Confused Between (1) The Actual Exchange Rate Used To Administer SALTS' Subcontract With Lechmotoren And (2) The Various Currency Rates That SALTS Paid When, From Time-to-Time, SALTS Acquired DMs At Its Own Expense At Public Currency Exchanges

II. It Is Beyond Contention That The Actual Incurred Exchange Rate In The Administration Of SALTS' Subcontract With Lechmotoren Was 1 USD = 1.5 DM

III. FIRST ELEMENT: "The Data Meets The Definition of Cost or Pricing Data"
*SALTS' Position: The definition of cost or pricing data includes facts that "prudent buyers and sellers would reasonably expect to affect price negotiations significantly." Here, the "the actual exchange rate data it [SALTS] was incurring in purchasing the foreign currency to pay Lechmotoren" does not fall within the definition of cost or pricing data because it had no effect on price negotiations.*

IV. SECOND ELEMENT: "The Data was Reasonably Available"
*SALTS' Position: SALTS does not contest that "the incurred exchange rate data" that SALTS paid when, from time-to-time, SALTS acquired DMs on open exchanges at private expense, were reasonably available. In fact, the exchange rates were in the public domain and readily available to the USG. Inasmuch as the USG had "actual knowledge thereof" regarding "the incurred exchange rate data", the incurred exchange rate cannot serve as a basis for defective pricing.*

V. THIRD ELEMENT: "The Data was Not Disclosed"
*SALTS' Position: The actual currency exchange rate used to administer SALTS' subcontract with Lechmotoren was 1 USD = 1.5 DM. This currency rate was disclosed to the USG.*

VI. FOURTH ELEMENT: "The Government Relied on Defective Data"
*SALTS' Position: Assuming, arguendo, that SALTS should have disclosed that SALTS was, from time-to-time, acquiring DMs on the open market, the USG had no basis to rely on the SALTS failure to disclose for reasons set forth in Section III, supra. Specifically, by awarding a FFP contract, the USG had already placed the maximum risk of currency fluctuation*

> *on SALTS. The fact that SALTS was behaving as a prudent international contractor by trying to hedge its risk was of little consequence to the USG. Accordingly, the information was nothing that the USG would have relied upon.*
>
> VII. FIFTH ELEMENT: "The Contract Price was Significantly Impacted"
> *SALTS' Position: See the discussion in Section III (information concerning SALTS acquiring DM on the open market does not fall within the definition of cost or pricing data because the information could not reasonably be expected to affect price negotiations significantly.) See also the discussion in Section VI (USG negotiator would not have relied on the undisclosed information).*

(Id.) The Contracting Officer has never replied to SALTS' letter of August 6, 2003. Moreover, the Contracting Officer has never provided any disclosure, information, or clarification to SALTS concerning which of the facts presented or clarifications provided were accepted or which of the seven arguments the Contracting Officer believed lacked merit. No identification was given of factual areas of agreement and disagreement between the positions taken by the parties.

On or about August 25, 2003, the Contracting Officer was provided a declaration of Colonel William E. Borchardt, USAF (Retired), an expert with extensive government and private sector experience in defective pricing. (See Colonel Borchardt's declaration at App. 3). Colonel Borchardt's six-page declaration provided extensive analysis, including an explanation of the customary practice of defense contractors to protect themselves against currency fluctuation. (Id.) The declaration explains why currency fluctuations, and the steps taken by corporations to protect themselves against currency fluctuations, are not cost or pricing data. (Id.)

The Contracting Officer never provided any response to SALTS concerning Colonel Borchardt's explanation of currency fluctuations and the steps taken by corporations to protect themselves against currency fluctuations. The Contracting Officer never responded to his expert opinion that the steps taken by SALTS (and other similarly situated government contractors) to avoid currency fluctuation are not properly characterized as cost or pricing data. After SALTS provided the Contracting Officer with Colonel Borchardt's declaration, she never sought to communicate further with SALTS about the Audit Report until she issued what she described as a "final decision" – forty-five months later. (App. 1; see also doc. nos. 1 and 10 at ¶¶ 47-49). The Contracting Officer's purportedly "final decision" of March 14, 2007 merely makes reference to the Audit Report without adopting any findings of the auditor as her own. (Id.) Further, the "final decision" does not address or respond to any of the matters raised by SALTS.

The Contracting Officer's "final decision" of March 14, 2007 does not provide any indication or explanation concerning whether and, if so, why she rejected the seven grounds submitted in support of SALTS' contention of no defective pricing in its August 6, 2003 letter. (Compare App. 1 with App. 2). Additionally, the Contracting Officer's alleged "final decision" of March 14, 2007 does not provide any explanation as to whether and, if so, why she rejected the explanation of Colonel Bochardt that currency fluctuations and the steps taken by corporations to protect themselves against currency fluctuations are not properly identified as or includable in cost or pricing data. (Id.; see also App. 3). The Contracting Officer's "final decision" does not provide an explanation

as to why forty-five months passed without any communication to SALTS about the alleged defective pricing. (Id.)

SALTS did not sit on its rights asserted in this motion. In a letter dated June 2, 2007, SALTS responded to the Contracting Officer's ineffective "final decision" of March 14, 2007 by stating as follows:

> SALTS received your March 14, 2007 letter on April 8, 2007. As set forth below, your March 14, 2007 letter contravenes the clear statutory and regulatory instructions for the content of a final decision. Because these requirements have not been met, your final decision is legally ineffective and does not trigger the start of the filing time for an appeal under the Contract Disputes Act ("CDA") of 1978. SALTS respectfully requests that you comply with your statutory and regulatory obligations by re-issuing your final decision stating the reasons for the decision.

(App. 4; doc. nos. 1 and 10 at ¶ 50). This letter provided a complete explanation to the Contracting Officer detailing the basis for SALTS' contention that the "final decision" did not conform with statutory and regulatory requirements necessary for the decision to become final. SALTS' letter of June 2, 2007 contained the following headers:

> *A. Your Attempted Final Decision Was Legally Insufficient To Trigger The Start Of The Filing Period For The CDA*
>
> *B. A Landmark Decision Of The Court Of Appeals For The Federal Circuit Is Insightful In Showing That Your March 14, 2007 Letter Was Legally Insufficient To Trigger The Start Of The Filing Period For The CDA*
>
> *C. The Use Of Statutory Interpretation Similarly Leads To A Conclusion That The Term "State The Reasons For The Decision Reached" Means That You Were Obligated To Address The Seven Assertions Raised By SALTS*

> *D. Your Duty To "State The Reasons For The Decision Reached" Cannot Be Ignored Under The Guise Of Contracting Officer Discretion*

(Id.)

On June 27, 2007, the DCAA auditor who prepared the Audit Report sent an e-mail to a SALTS employee stating as follows:

> Ernie, if you remember, I am the auditor who performed the 2001 post award audit. I have been tasked by the requestor to address the seven assertions from SALTS's August 6, 2003 letter and the points made by William Borchardt from August, 5, 2003. In order to address SALTS' points I need to understand them more fully.

(App. 5). The June 27, 2007 e-mail from the DCAA auditor contained fourteen paragraphs of questions/comments concerning the basis for the positions taken and expressed in SALTS' August 6, 2003 letter regarding the absence of defective pricing. (Id.) The June 27, 2007 e-mail from the DCAA auditor also contained nine paragraphs of questions/comments concerning the explanation in Colonel Borchardt's declaration regarding currency fluctuations and the steps taken by corporations to protect themselves against currency fluctuations which, in his expert opinion, are not includable as cost or pricing data. (Id.) The DCAA auditor sent a copy of his June 27, 2007 e-mail to the Contracting Officer "Davis, Tanya Ms CIV USA AMC." (Id.)

On July 13, 2007, SALTS responded to the DCAA auditor's e-mail as follows:

> Thank you for your e-mail of June 27, 2007. It is clear that you have put a lot of work into your questions/comments. Although it will take some work on our part, SALTS is prepared to respond to your seven pages. However, before doing so, it would seem prudent to make sure neither of us is wasting his time.

> On March 14, 2007 the Contracting Officer, Tanya Davis, issued a final decision on this matter. According to the law, "the contracting officer's decision on the claim shall be final and conclusive." 41 U.S.C. § 605(b). In short, because Ms. Davis has already issued a final decision, anything that you or I now do for Ms. Davis would appear to be a waste of time since her decision is "final and conclusive."
>
> Ms. Davis has the prerogative to rescind her final decision. If she were to do so, it would make sense for the two of us to pursue your questions/comments. Then, after she has reviewed your painstaking input, she can re-issue her decision.
>
> SALTS' letter dated June 2, 2007 suggested to Ms. Davis that her final decision appeared premature. SALTS requested Ms. Davis to re-issue her final decision after she had acquainted herself with all the facts.
>
> Among the facts that SALTS urged her to consider are, the seven assertions why the Government has no basis to allege that SALTS provided defective cost or pricing data (Ref: SALTS letter dated Aug. 6, 2003 to your predecessor, Mr. Johnson) and a declaration Mr. Johnson received from Col. William Borchardt, USAF (Ret.) on August 27, 2003 setting forth two explanations why the means SALTS that sought to protect itself from currency fluctuation was not cost or pricing data.
>
> To summarize, if Ms. Davis agrees to rescind her March 14, 2007 final decision, I would be delighted to commit the resources to answer your questions/comments. However, at this time SALTS is still waiting for a response to its June 2, 2007 letter to Ms. Davis.

(App. 6). In a letter dated July 17, 2007, the Contracting Officer replied to SALTS' letter of June 2, 2007, stating as follows:

> It is the Government's opinion that the final decision issued by the referenced March 14, 2007 letter, fully met the requirements of the Contract Disputes Act, and the Federal Acquisition Regulations, concerning the time for appeal of the Contracting Officer's final decision on this matter.

(App. 7).

## ARGUMENT

### I. The Contracting Officer's Letter of March 14, 2007 Failed To Comply With The Requirements For A Final Decision.

The requirement that the contract officer issue a written decision on government claims has been a staple of government contracting law for more than forty years. The contracting officer's written decision is supposed to identify its finality, state the reasons behind the decision, and inform the contractor of its appeal rights. The courts and boards have strictly enforced these standards as mandatory prerequisites to consideration of government claims for that case. These safeguards are intended to protect contractors from government claims not complying with the requirements for final decisions.

The requirements for a final decision on government claims, first articulated in decisions of the United States Court of Claims, were codified in the Contract Disputes Act of 1978 ("CDA") and the Federal Acquisition Regulation ("FAR"). <u>See</u> FAR § 1.000-53.000. The CDA regulations clearly and forcefully state that the contracting officer "shall" inform contractors in a written decision of certain required information. The CDA, 41 U.S.C. § 605(a), requires a contracting officer, when issuing a final decision, to state the reasons. Specifically, section 605(a) provides as follows:

> The contracting officer shall issue his decisions in writing, and shall mail or otherwise furnish a copy of the decision to the contractor. **The decision <u>shall</u> state the reasons for the decision reached,** and shall inform the contractor of his rights as provided in this chapter.

41 U.S.C. § 605(a) (emphasis added). Here, the Contracting Officer <u>never</u> provided the reasons for her decision. Clearly, in issuing her alleged "final decision," the Contracting

Officer did not comply with 41 U.S.C. § 605(a). Further, after having this fact brought to her attention, the Contracting Officer did not take subsequent measures to cure the inadequacies identified by SALTS. (See App. 4). Instead, the Contracting Officer summarily took the position, as noted above, that she had, in fact, complied with applicable statutes and regulations. (See App. 7).

Not only is the Contracting Officer obligated to follow 41 U.S.C. § 605(a), but also the provisions of FAR that implement the CDA. In short, provisions of the FAR that implement the CDA have the force and effect of law.

> FAR and DFARS issue pursuant to statutory authority and in conformance with required statutory and regulatory procedures.... FAR § 1.301(b) (2002). These regulations consequently have **the force and effect of law**. See Newport News Shipbuilding & Dry Dock Co. v. Garrett, 6 F.3d 1547, 1552 (Fed. Cir. 1993) (FAR § 33.207(c)(2) was binding on courts, not merely an interpretive regulation).

Dyncorp Info. Sys., LLC v. United States, 58 Fed. Cl. 446, 451 (2003) (emphasis added). Courts interpret FAR provisions based on their plain language and common meaning. Id. at 451-52 (internal citation omitted).

The phrase "state the reasons for the decision reached" contained in section 605(a) is not defined in the CDA. In implementing the CDA, as discussed below, the FAR provides ample guidance on the meaning of that phrase. Again, this implementation of the CDA in the FAR has the "force and effect of law" and is "binding on courts, not merely an interpretive regulation." Id. 58 Fed. Cl. at 451-52.

**A. The FAR, As An Implementing Regulation Of The CDA's "State The Reasons For The Decision Reached," Required The Contracting Officer To Identify "Factual Areas Of Agreement**

**And Disagreement" and To Provide Supporting Rationale For Her Decision.**

The operative contract between the parties contained FAR § 52.233-1 entitled "Disputes." FAR § 52.233-1(d)(1) states: "[a] claim by the Government against the Contractor shall be subject to a written decision by the Contracting Officer." The "written decision of the Contracting Officer" is defined in FAR § 33.211(a)(4), and specifically, provides that the written decision "shall include … (iii) statement of the factual areas of agreement and disagreement; (iv) statement of the contracting officer's decision, with supporting rationale." As a review of the letter itself reveals, the "final decision" of the Contracting Officer in the present case did not include either a "statement of the factual areas of agreement and disagreement" or the supporting rationale for the Contracting Officer's decision. (See App. 1). Therefore, the decision did not meet the requirements of a final decision. The Contracting Officer may neither ignore these mandatory requirements or her duty to communicate with SALTS, nor can she rely on communications by others with SALTS as a substitute to meet her own responsibilities.

A contracting officer is obligated to put her own mind to the problems. That is, a contracting officer must not issue a final decision until she makes a personal and independent review of the dispute, an analysis regarding the same, and renders her own final decision. "The agency has not complied with the fundamental requirement that final decisions on contract claims ought to reflect the independent determination of the contracting officer." Lavezzo v. United States, 74 Fed. Cl. 502, 504 (2006) (citing Pacific Architects & Eng'rs, Inc. v. United States, 203 Ct. Dl. 499, 518, 491 F.2d 734,

744 (1974); New York Shipbuilding Corp. v. United States, 180 Ct. Cl. 446, 460, 385 F.2d 427, 435 (1967). The "final decision" of the Contracting Officer does not, in this case, reflect her own independent determination. Indeed, she did not even adopt the findings of the Audit Report.

The Contracting Officer did not comply with the fundamental requirements associated with a final decision. The Contracting Officer simply ignored these requirements and issued a legal conclusion without addressing the facts or rationale. Such an approach defeats the fundamental purposes behind the established process, and cannot be supported. Therefore, the Government's counterclaim is due to be dismissed with instructions to issue a final decision.

### B. The FAR Required The Contracting Officer To Prepare A Memorandum Documenting Her Decision And To Provide A Copy Of The Memorandum To SALTS.

The essence of the Contracting Officer's "final decision" is a determination that SALTS is liable to the Government for defective cost or pricing data. The applicable provision of the FAR is § 15.407-1 entitled "Defective cost or pricing data." Paragraph (d) of that section states, in pertinent part, as follows: "[t]he contracting officer shall prepare a **memorandum documenting** … the determination. . . . A copy of the memorandum or other notice of the contracting officer's determination shall be provided to the contractor." FAR § 15.407-1(d) (emphasis added). In SALTS' letter of June 2, 2007, the Contracting Officer was reminded of her obligation to prepare a memorandum documenting her decision and to provide SALTS with a copy. (See App. 4).

Nevertheless, the Contracting Officer neither complied with FAR § 15.407-1, nor provided any explanation as to her failure to do so.

FAR Part 4 – Administration Matters – contains "housekeeping" regulations. SALTS does not contend that FAR Part 4 implements the CDA. Nevertheless, it is noteworthy that, as a matter of proper contract administration, the Contracting Officer was required to take actions that closely parallel her duty under 41 U.S.C. § 601. Specifically, FAR § 4.801 states, in pertinent part, as follows:

> (b) The documentation in the files (see 4.803) shall be sufficient to constitute a complete history of the transaction for the purpose of --
>
> (1) Providing a complete background as a basis for decisions at each step in the acquisition process;
>
> (2) Supporting actions taken;
>
> (3) Providing information for reviews and investigations, and
>
> (4) Furnishing essential facts in the event of litigation or congressional inquiries.

It is clear from a review of the overall statutory and regulatory scheme that the Contracting Officer is to both document and communicate vital information supporting actions taken to the contractors. The Contracting Officer did not do so in this instance.

In summary, the CDA required the Contracting Officer's final decision to "state the reasons for the decision reached." FAR § 33.211(a)(4), in implementing the CDA, makes clear that this statutory prerequisite for a final decision must include supporting rationale, as well as an explanation of where the parties factually agree and disagree. Moreover, the Contracting Officer was required by FAR § 15.407-1 to provide SALTS

with a memorandum documenting her response to and agreement or rejection of the seven reasons in SALTS letter of August 6, 2003, and the explanation of Colonel Borchardt related to the lack of defective pricing. The Contracting Officer failed to comply with these fundamental requirements for issuance of a final decision. Further, the decision does not reflect her own independent analysis, reasoning, or determination. Therefore, the Contracting Officer's letter of March 14, 2007 failed to meet the CDA and implementing FAR requirements for a final decision.[1]

## II. The Contracting Officer's Letter Of March 14, 2007 Is An Invalid Final Decision Thus Depriving This Court Of Jurisdiction.

The violations of the CDA were highly prejudicial to SALTS. Among the purposes of the CDA is to "provide to the fullest extent practicable, informal, expeditious, and inexpensive resolution of disputes." 41 U.S.C. § 607(e). According to the legislative history of the CDA, Congress intended that (as a matter of fair and equitable treatment of contractors) the contracting officer first attempt to resolve disputes by negotiation.

> The [CDA] provides a fair, balanced, and comprehensive statutory system of legal and administrative remedies in resolving Government contract claims. The act's provisions help **to induce resolution of more contract disputes by**

[1] As a norm, "[t]hroughout the procurement process, contracting officers are entitled to exercise discretion upon a broad range of issues confronting them." OTI America, Inc. v. United States, 68 Fed. Cl. 646 (2005). However, a contracting officer's discretion does not extend to violating the FAR:

> The procurement regulations also have the force of law. Paul v. United States, 371 U.S. 245, 255, 83 S.Ct. 426, 9 L.Ed.2d 292 (1963). When a prima facie showing of the violation of those regulations has been made the agency may not be heard to say that the matter in question has been left to its discretion.

Scanwell Laboratories, Inc. v. Shaffer, 424 F.2d 859, 874 (C.A.D.C. 1970).

> **negotiation prior to litigation**; equalize the bargaining power of the parties when a dispute exists; provide alternate forums suitable to handle the different types of disputes; and **insure fair and equitable treatment to contractors** and Government agencies.

SMS Data Products, Inc. v. United States, 19 Cl. Ct. 612, 614 (1990) (citing S. Rep. No. 1118, 95th Cong., 2d Sess. 1 (1978), U.S. Code Cong. & Admin.News 1978, p. 5235) (emphasis added).

Below are some examples of how the Contracting Officer's violations of the CDA were prejudicial to SALTS. SALTS has been deprived of any opportunity to negotiate a resolution before litigation. The Contracting Officer did not provide any response to SALTS letter of August 6, 2003 that would inform SALTS of the Government's assessment of SALTS' position regarding defective pricing. (App. 2). Similarly, the Contracting Officer did not reply to Colonel Borchardt's explanation as to why there had been no defective pricing. (App. 3). As a result, SALTS has been deprived of the opportunity to seek a negotiated settlement prior to litigation.

The Contracting Officer said nothing and took no action for forty-five months in the face of SALTS' undeniable conclusion that no defective pricing had occurred. Then, to SALTS' surprise, the Contracting Officer summarily demanded interest payments "at the approximate rate of $1,536.56" per day. (App. 1). The Contracting Officer's silence for forty-five months and then "sandbagging" SALTS with a demand for approximately $1,536 in interest per day is not consistent with the purpose of the CDA to "insure fair and equitable treatment [of] contractors."

After receiving the March 17, 2007 "final decision," SALTS petitioned the Contracting Officer to comply with her responsibilities under the CDA. (App. 4). While waiting for the Contracting Officer to respond to the request to take corrective action, more than ninety days lapsed from the date the Contracting Officer issued her alleged final decision. SALTS was deprived an opportunity to pursue relief at the Armed Services Board of Contract Appeals—a more expeditious and less expensive forum.

The CDA process is designed to allow a contractor to better understand the strengths and weakness of its case before having to commit significant resources to litigation. Here, however, because the Contracting Officer ignored the CDA and its implementing regulations, SALTS has been forced to make the decision to litigate without the benefit of the required statement of reasons for the "final decision."

The failure of the Contracting Officer to comply with the CDA was highly prejudicial to SALTS. The above-referenced prejudice highlights the fundamental need for compliance with the statutory and regulatory requirements imposed on contracting officers before issuing final decisions. This Court is one of limited jurisdiction and, without a valid final decision (a condition precedent to invocation of this Court's jurisdiction), it must dismiss the Government's counterclaim with instructions to issue a final decision.

In Johnson Controls World Services, Inc. v. United States, 43 Fed. Ct. 589 (1999), the plaintiff sought relief from a contracting officer's final decision demanding payment of $56,115,322 for noncompliance with an obligation to refund a pension plan surplus. The Government asserted a counterclaim setting forth two counts. The Court of Federal

Claims dismissed two components of the counterclaim for lack of jurisdiction because that subject matter was not addressed in the contracting officer's final decision.

The Johnson Controls court stated as follows:

> Under the [CDA], "[a]ll claims by the government against a contractor relating to a contract shall be the subject of a decision of the contracting officer." 41 U.S.C. § 605(a) (West Supp. 1998) (the "CDA"); see Applied Cos. v. United States, 144 F.3d 1470, 1477 (Fed. Cir. 1998); Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1575 (Fed. Cir. 1995); Sharman Co. v. United States, 2 F.3d 1564, 1568-69 (Fed. Cir. 1993); Joseph Morton Co. v. United States, 757 F.2d 1273, 1279-80 (Fed. Cir. 1985). A **valid** final decision by the contracting officer is thus "a 'jurisdictional prerequisite' to further legal action thereon." Sharman Co., 2 F.3d at 1568 (quoting 138 Cong. Rec. S17799 (daily ed. Oct. 8, 1992) (statement of Sen. Heflin)).

Johnson Controls, 43 Fed. Cl. at 592 (emphasis added). As established in Johnson Controls, a claim by the government against a contractor requires a final decision of the contracting officer. Moreover, a "**valid** final decision by the contracting officer is 'a jurisdictional prerequisite' for the Court of Federal Claims." Id. (emphasis added). Because a valid final decision does not exist, the jurisdictional prerequisite for further legal action is not present.

In Imperator Carpet & Interiors, Inc., GSBCA No. 6156, 81-2 BCA ¶15,248, the GSBCA dismissed a claim for lack of jurisdiction because the contracting officer did not comply with 41 U.S.C. § 605(a). Although not factually analogous, the GSBCA decision explains that a valid final decision under 41 U.S.C. § 605(a) requires four distinct components. One of the four components is the provision of a basis for the decision reached.

> In this case, we must decide whether or not the contracting officer's letter of June 11, 1980 … meets the four standards imposed by the [CDA] for a contracting officer's decision. We decide that it does not. It was in writing and communicated to the contractor.… **It did provide reasons for the decision reached.** (Whether or not we might agree with those reasons is quite another issue, however.) But it did not inform the contractor of its right to obtain review by this Board or the United States Court of Claims. For that reason, it was not a decision as contemplated by Section 6(a) of the Act, 41 U.S.C. § 605(a) (Supp. II 1978).

Id. (emphasis added).

A final decision of a contracting officer is not valid unless it provides the reasons for the decision reached. In the present case, the March 14, 2007 "final decision" of the Contracting Officer is invalid because she did not provide the reasons for the decision reached. She did not even conduct her own independent analysis of the dispute, much less render an independent determination. Because the "final decision" is invalid, this Court does not have jurisdiction over the alleged defective pricing claims.

## CONCLUSION

In Daewoo Engineering & Construction Co. v. United States, 73 Fed. Cl. 547 (2006), the Court of Federal Claims confronted a situation where the contractor was held to have exaggerated the amount of its claims based on a "horsetrading theory." Id. at 581. Observing that the CDA was intended to discourage unwarranted claims, the Court held that Daewoo forfeited its claims. Id. at 583. The Court observed, "[t]he purpose of the CDA is to prevent this sort of gamesmanship." Id. at 569.

Contracting Officers are also capable of inappropriate "gamesmanship." Under the present facts, the Contracting Officer has engaged in gamesmanship by ignoring

SALTS' opposition to the Audit Report. The Contracting Officer even ignored SALTS' requests that she comply with statutory and regulatory requirements. Forty-five months later, the Contracting Officer issued a "final decision" in which she abrogated her duties and ignored the numerous compelling reasons refuting the DCAA's assertions regarding defective pricing. In her purportedly "final decision," the Contracting Officer failed to provide any basis to support a finding of defective pricing.

The purpose of the CDA is to prevent this sort of gamesmanship. Daewoo Eng'g, 73 Fed. Cl. at 569. Just as this Court will not tolerate gamesmanship on the part of a contractor that is contrary to a purpose of the CDA, so too this Court should not tolerate the gamesmanship of a contracting officer that is contrary to a purpose of the CDA. For the reasons set forth above, this action is due to be dismissed for lack of jurisdiction.

Submitted this the 7th day of July, 2008.

**s/ Roderic G. Steakley**

Roderic G. Steakley
Matthew B. Reeves
**Sirote & Permutt, P.C.**
305 Church Street Suite 800
Huntsville, Alabama 35801
(256) 536-1711 Telephone
(256) 518-3681 Facsimile
rsteakley@sirote.com
mreeves@sirote.com

**OF COUNSEL:**
**s/ Jerome S. Gabig, Jr.**

Jerome S. Gabig, Jr.
515 Sparkman Drive
Huntsville, Alabama 35816
(256) 509-0279 Telephone
(256) 704-6002 Facsimile
gabig3@comcast.net