# APPENDIX "2"

سولتس
SALTS

المؤسسة السعودية للإمدادات والمساندة الفنية
Saudi Logistics and Technical Support

2/5/12/03/528

6 August 2003
Charles J. Johnson
Contracting Officer
Patriot/UAV Acquisition Branch A
U.S. Army Aviation & Missile Command
5300 Martin Road
Redstone Arsenal, AL 35898-5000

Ref: Your letters of April 14, 2003 and July 22, 2003

Dear Mr. Johnson:

Thank you for the extension in your letter dated July 22, 2003. It is my understanding that you wish me to address the following assertion by DCAA:

> SALTS did not provide the most current cost or pricing data in **regards to the actual exchange rate data it was incurring in purchasing the foreign currency to pay Lechmotoren** (subcontractor), even though this was significantly different from the exchange rate that the proposed subcontract costs were based on.

DCAA Audit Report No. 2191-2001S42000002 (Sept. 19, 2002) at Executive Summary, first significant issue (emphasis added).

It is SALTS' position that there is no merit to the DCAA's assertion that SALTS has violated its obligation under the Price Reduction for Defective Cost or Pricing Data clause, FAR 52.215-10, located in the Basic Agreement. To convince you that DCAA is incorrect, I am providing the following analysis: First, much of the misunderstanding can be eliminated by showing that the DCAA is confused between (1) the actual exchange rate used in the administration of the SALTS' subcontract with Lechmotoren and (2) the various currency rates that SALTS paid when, from time-to-time, SALTS acquired DMs at its own expense. Second, it is beyond contention that the actual incurred exchange rate in the administration of SALTS' subcontract with Lechmotoren was 1 USD = 1.5 DM. Finally, to further assure you that there is no defective pricing, I have provided some analysis that parallels the five elements of a defective pricing case identified in the DCAA Audit Report at page 6.

## I. The DCAA is Confused Between (1) The Actual Exchange Rate Used To Administer SALTS' Subcontract With Lechmotoren And (2)The Various Currency Rates That SALTS Paid When, From Time-to-Time, SALTS Acquired DMs At Its Own Expense At Public Currency Exchanges

The DCAA Audit Report makes much ado about "**the actual exchange rate data it was incurring to purchasing the foreign currency to pay Lechmotoren.**" (Emphasis added.) Not only does this text appear as the first significant issue in the Executive summary, but also the same assertion is made in the "Summary of Conclusions" at page 4. It is helpful to understand how the DCAA became fixated on "**the actual exchange rate data it (SALTS) was incurring to purchasing the foreign currency to pay Lechmotoren.**" During the visit of the DCAA auditor to SALTS, he had discussions with John D'Mello, SALTS' Financial Manager. Mr. D'Mello informed the DCAA auditor that, from time-to-time, SALTS would spend its private funds to acquire DMs at public currency exchanges.[1] Whenever SALTS acquired DMs, the exchange rate would generally vary based on the market conditions at the time.

Page 6 of the Audit Report contains DCAA's cursory analysis of the five elements of a defective pricing case. On that page, the term "actual exchange rates" is used three times. It is apparent from these three references to "actual exchange rates" that DCAA is confused as to the actual incurred exchange rates used in the administration of SALTS' subcontract with Lechmotoren. DCAA's confusion is fully manifested on page 10 in DCAA's attempt to quantify the amount of the alleged defective pricing. Specifically, on page 10, there is a column labeled ***"$ Amount Using 1.50 Exchange Rate"*** as well as a column labeled ***"$ Amount Based On Actual Incurred Exchange Rates."*** These two columns should have identical numbers since the actual incurred exchange rate was 1 USD = 1.50 DM. Stated differently, the DCAA has wrongfully confused "$ Amount Based On Actual Incurred Exchange Rates" (which should have been calculated using the 1 USD = 1.50 DM exchange rate) with the various currency rates that SALTS paid when, from time-to-time, SALTS acquired DMs at its own expense.

---

[1] In international business, it is common practice for corporations to protect themselves against the risk of currency fluctuations. *See generally, http://www.mentor.com/investor_relations/reports/10k_00.pdf.* One way to hedge the risk of currency fluctuation is to purchase foreign currencies.

**II. It Is Beyond Contention That The Actual Incurred Exchange Rate In The Administration Of SALTS' Subcontract With Lechmotoren Was 1 USD = 1.5 DM.**

As shown by the analysis below, it is beyond contention that the actual incurred exchange rate in the administration of SALTS' subcontract with Lechmotoren (a German corporation) was 1 USD = 1.5 DM. The relationship between SALTS and Lechmotoren began with the USG issuing a previous delivery order against the Basic Agreement for SALTS to provide power suppliers. Based on the preceding delivery order, SALTS entered into a subcontractor relationship with Lechmotoren. Hence, SALTS and Lechmotoren had an established course of dealing with each other before delivery order 0004.

One course of dealing involved Lechmotoren being paid in DM notwithstanding the fact that the subcontract's CLINs were firm fixed price in USDs. During the course of the first contract, Lechmotoren would invoice in DMs using a contractually established exchange rate of 1USD = 1.5 DM. This course of dealing continued after the USG issued a second delivery order to SALTS for power supplies.

The second delivery order, 0004, began in earnest when the USG awarded a NTE contract to SALTS for power supplies. SALTS, in turn, negotiated a NTE subcontract with Lechmotoren for power supplies. During the course of the NTE subcontract, Lechmotoren would examine the subcontract's dollar-based CLINs and prepare invoices in DMs using an exchange rate of 1USD = 1.5 DM. Later, the USG definitized the NTE contract. As part of the definitization process, the USG entered into verbal negotiations with SALTS during 23-29 February 2000.

One of SALTS negotiators prepared a contemporaneous memorandum of the negotiations. According to the memorandum, the following was the first negotiation issue for the USG:

> Audit report of SALTS subcontractor LECHMOTOREN by Bundesamt for Wehrtechnik that questioned 25% of proposal due to DM to $ exchange rate and cost proposed in dollars that were incurred/to be incurred in DM.

*See* attachment 1, SALTS Memorandum of Negotiations, March 1, 2000.

Concerning the USG's first negotiation issue, SALTS was in a dilemma. The USG negotiator related that the Bundesamt report questioned 25% of Lechmotoren's cost proposal. SALTS, however, was denied access to the Bundesamt report. The SALTS negotiators related to Lechmotoren the assertions made by the USG negotiations concerning the Bundesamt report. Lechmotoren insisted that the assertions by the USG

negotiator were incorrect. Relying on the assertions by the USG negotiator, SALTS insisted that Lechmotoren reduce its prices. *See* Attachment 2.

Caught between two contradictory representations concerning the content of the Bundesamt report, SALTS reached the following accommodation with the USG:

> SALTS agreed with the USG to the subcontract cost for LECHMOTOREN of $23,682,497 vice the proposed amount of $24,165,813 even though LECHMOTOREN had not agreed to any reduction and held to the caveat in their proposal of a final negotiation settlement of exchange rate.

Attachment 1, Para. 3.[2]

On March 29, 2000, the USG awarded 0004 to SALTS on a fixed price basis. On July 21, 2000, SALTS negotiated with Lechmotoren to definitize the NTE subcontract into a fixed price subcontract. As memorialized in my July 30, 2000 letter, Lechmotoren resisted SALTS attempt to negotiate a 5% reduction because Lechmotoren disagreed with the USG's explanation of the Bundesamt report. *See* attachment 3. Accordingly, SALTS made the following concession:

> Considering the longstanding relationship between SALTS and Lechmotoren, SALTS agrees to bear the cost difference between the subcontract costs with the USG and Lechmotoren's subcontract value.

Attachment 3.

The definitization letter of July 30, 2000 also stated that, unless otherwise agreed, "all other terms and conditions remain the same". Among the terms and conditions that remained the same were those in Lechmotoren's firm fixed price proposal dated Aug. 10 1999. See attachment 4. In particular, Lechmotoren's firm fixed price proposal states, "Above mentioned prices are based on exchange rate: 1US$ = 1.5DM." Stated differently, the USD prices in the subcontract's CLINs were to become firm fixed prices. Consistent with the previous course of dealings between SALTS and Lechmotoren, notwithstanding the CLIN prices were in USDs, Lechmotoren continued to send invoices

---

2 The DCAA auditor insisted on a telephone call with the USG negotiator regarding this matter. The telephone call was placed on March 25, 2002. Participating in the telephone call was the USG negotiator, Troy Vesper (SALTS' Contracts Manager), Mr. Hanks (SALTS' Financial Specialist), and the auditor. It was during this telephone conversation that SALTS learned for the first time that there was no basis for the assertion by the USG negotiator that the Bundesamt report questioned 25% of Lechmotoren's proposal costs. Simply put, the USG was "overreaching" in violation of FAR § 1.102(b)(iii)(3) which required the USG to "conduct business with integrity, fairness, and openness." Under Spalding and Sons, Inc. v. United States, 24 Cl. Ct. 112, SALTS is entitled to an unjust enrichment claim for the overreaching. Alternatively, the $483,316 that SALTS reduced its price as a result of the overreaching should, at a minimum, be an offset under FAR § 52.215-10(c)(2).

in DM using the 1USD = 1.5 DM conversion rate. In this regard, Lechmotoren was also contractually bound to the 1USD = 1.5 DM exchange rate for the 0004 deliverables.

It is noteworthy that the Audit Report corroborates a major tenet of SALTS' argument both the prime contract and the subcontract were firm fixed price. Just as SALTS' definitization letter to Lechmotoren established a firm fixed price contract for $24,165,813, so too the Audit Report confirms that SALTS and Lechmotoren administered the subcontract as a firm fixed price contract for $24,165,813. This conclusion is apparent on page 10 of the Audit Report. On the very bottom of the page under the row labeled *"Total Cost"* and the column entitled *"$ Amount Using 1.50 Exchange Rate"* is the number $24,165,813. Hence, the DCAA has confirmed that Lechmotoren was paid the exact amount set forth in the definitized firm fixed price subcontract.

In summary, as shown by the above explanation of how this firm fixed price subcontract was actually administered, it is beyond contention that the actual incurred exchange rate in the administration of SALTS' subcontract with Lechmotoren was 1 USD = 1.5 DM.

Finally, SALTS acknowledges that its use of the exchange rate of 1USD = 1.50 DM in the subcontract with Lechmotoren resulted in more profit than either SALTS or the USG originally expected. SALTS suspects that the Audit Report is largely motivated by DCAA taking umbrage with the fact the amount of profit that SALTS made. Nevertheless, SALTS' successful hedge on 1 USD = 1.5 DM exchange rate should not be a basis for DCAA to fashion a defective pricing argument based on exchange rates. The law is well-established that the Truth In Negotiations Act (TINA) is not to be used as "the equivalent of an excess profit law." Sparton Corporation, ASBCA No. 11363, 67-2 BCA ¶ 6539, aff'd on recon. 68-1 BCA ¶ 6730.

**III. FIRST ELEMENT: "The Data Meets The Definition of Cost or Pricing Data"**

***SALTS' Position: The definition of cost or pricing data includes facts that "prudent buyers and sellers would reasonably expect to affect price negotiations significantly." Here, the "the actual exchange rate data it [SALTS] was incurring in purchasing the foreign currency to pay Lechmotoren" does not fall within the definition of cost or pricing because it had no effect on price negotiations.***

According to DCAA, the first element of a defective pricing case is that "the data meets the definition of cost or pricing data." DCAA Audit Report at 6. The definition of cost or pricing data in FAR § 2.101 includes information that "prudent buyers and sellers would reasonably expect to affect price negotiations significantly." The analysis below will show that "**the actual exchange rate data it [SALTS] was incurring in**

**purchasing the foreign currency to pay Lechmotoren"** does not fall within the definition because it had no effect on price negotiations.

The discussion in Section II, *supra*, establishes that 0004 between the USG and SALTS was a firm fixed price contract. FAR § 16.202-1 states "[t]his contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profits." By virtue of being a firm fixed price contract, one of those risks that had been placed on SALTS was the risk of currency fluctuation. The fact that SALTS bore the entire risk of currency fluctuation is also consistent with case law:

> [T]he fact remains that in accepting an FFP contract, plaintiff accepted the risk and responsibility "for all costs under or over the firm fixed-price". This was a risk repeatedly held to include changes in currency values, and we find nothing unfair, unreasonable or illogical in holding the parties to the terms of their FFP contract.

ITT Artic Services Inc. v. United States, 207 Ct. Cl. 743, 524 F.2d 680 (1975).

As shown in ITT Artic Services Inc., it the policy of the USG, for firm fixed contracts, to shift the risk for currency fluctuations onto the contractor. In light of this policy, it is reasonable to assume that, if SALTS had informed the USG negotiator that SALTS was trying to mitigate this risk acquiring DMs using private funds, the USG negotiator would have done nothing with the information.[3] Because the USG negotiator would have done nothing with the information, a key part of the definition of cost or pricing data has not been met—one must reasonably expect that the undisclosed information would "affect price negotiations significantly."

The DCAA Audit Report summarily concludes, without any support, that the exchange rates that SALTS used to acquire DMs at private expense fall within the definition of cost of pricing data. Id. at 6. DCAA's unsupported conclusion is logically flawed. Put in proper perspective, the FAR's approach of placing "maximum risk and responsibility" on SALTS for currency fluctuation created "a gambling transaction" for SALTS.[4]

---

[3] In fact, the US negotiator deemed currency rates of such little importance that they did not merit being included his Price Negotiation Memorandum. See Attachment 6, letter from Charles Johnson dated 22 July 2003 regarding information contained in the USG's Price Negotiation Memorandum.

[4] *See generally*, Concrete Placing Co. v. U.S., 25 Cl. Ct. 369 (1992) ("in the context of discussing differing site conditions, by allowing contractors to seek equitable adjustments the government is able "to prevent bidders from increasing their bid prices to protect against misfortunes resulting from unforeseen developments, and thus avoid turning a construction contract into a **'gambling transaction.'**") (emphasis added).

Let's assume that, instead of making a profit on the purchase of DMs, SALTS had lost money. Would the USG be willing to pay an equitable adjustment to SALTS to partially compensate SALTS' for its loss?[5] In as much as the FAR has created a "gambling transaction" by placing the risk of currency fluctuation on vendors, would it make any difference if SALTS had purchased Japanese yen rather than German DM?[6]

## IV. SECOND ELEMENT: "The Data was Reasonably Available"

***SALTS' Position: SALTS does not contest that "the incurred exchange rate data" that SALTS paid when, from time-to-time, SALTS acquired DMs on open exchanges were reasonably available. In fact, the exchange rates were in the public domain and readily available to the USG. Inasmuch as the USG had "actual knowledge thereof" regarding published currency exchange rates, the failure of SALTS to provide the information cannot serve as a basis for defective pricing.***

According to DCAA, the second element of a defective pricing case is that "the data was reasonably available." DCAA Audit Report at 6. Concerning the law of defective pricing, the Government has no basis for a defective pricing allegation if the Government's representatives "have actual knowledge" of the information that supposedly was withheld. According to the Armed Services Board of Contracts Appeal:

> This Board has held previously that the contractor's statutory obligation to disclose cost and pricing data is satisfied if the Government representatives are advised of the data, and of its significance, or, if they are not so advised, **if they nonetheless have actual knowledge thereof.**

The Boeing Company, ASBCA No. 32753, 90-1 BCA ¶ 22270 (emphasis added).

Applying The Boeing Company to the present facts, the USG was fully aware of the exchange rates that currencies are publicly traded on open markets. Inasmuch as the USG had "actual knowledge thereof" regarding currency exchange rates available to

---

5 Obviously the answer is no. The Court of Appeal for the Federal Circuit has explained, "It is incorrect for the court to change, upon successful completion of the contract, the allocation of risk that was established in the contract and was present throughout its performance." Fairchild Industries, Inc. v. U.S., 71 F.3d 868 (Fed. Cir. 1995).

6 Perhaps a more probing question would be whether DCAA would have asserted defective pricing if the audited vendor had been a major international corporation. As mentioned in note 1, *supra*, trying to hedge against the risk of currency fluctuation is a common practice among international companies. It is puzzling why DCAA questions a hedging practice by SALTS but apparently DCAA does not question similar hedging practices by other international companies.

SALTS to purchase DMs, the failure of SALTS to provide that information to the USG cannot serve as a basis for defective pricing.

### V. THIRD ELEMENT: "The Data was Not Disclosed"

***SALTS' Position:** The actual currency exchange rate used to administer SALTS' subcontract with Lechmotoren was 1 USD = 1.5 DM. This currency rate was disclosed to the USG.*

According to DCAA, the third element of a defective pricing case is that "the data is not disclosed." Audit Report at 6. In Section II, *supra*, I fully established that the only currency exchange rate that falls within the definition of cost or pricing data was the actual currency exchange rate used to administer SALTS' subcontract with Lechmotoren. That currency exchange rate (*i.e.*, 1 USD = 1.5 DM) was properly disclosed to the USG.

Specifically, the 1 USD = 1.5 DM exchange rate was located in Lechmotoren's FFP proposal dated Aug. 10, 1999. *See* attachment 4. Lechmotoren's FFP proposal dated Aug. 10, 1999 was provided to your subordinate, Mr. Wilson, as an enclosure to SALTS letter of Sept. 28, 1999. *See* attachment 5. Because the currency rate of 1 USD = 1.5 DM was actually disclosed to the USG negotiator, DCAA cannot establish the third element to a defective pricing case.

### VI. FOURTH ELEMENT: "The Government Relied on Defective Data"

***SALTS' Position:** Assuming, arguendo, that SALTS should have disclosed that SALTS was, from time-to-time, acquiring DMs on the open market, the USG had no basis to rely on SALTS failure to disclose for reasons set forth in Section III, supra. Specifically, by awarding a FFP contract, the USG had already placed the maximum risk of currency fluctuation on SALTS. The fact that SALTS was behaving as a prudent international contractor by trying to hedge its risk was of little consequence to the USG. Accordingly, the information was nothing that the USG would have relied upon.*

According to DCAA, the fourth element of a defective pricing case is that "the Government relied on the defective data." Assume for the sake of argument that SALTS should have disclosed that it was, from time-to-time, acquiring DMs on the open market. Even if this assumption is correct (which it is not), the USG had no basis to rely on the alleged failure to disclose.

In particular, by awarding a FFP contract, the USG had already placed the maximum risk of currency fluctuation on SALTS. (*See* discussion in Section III, *supra*.) The fact that SALTS was behaving as a prudent international contractor by trying to hedge its risk by acquiring DMs was of little consequence to the USG. Accordingly, even if the information had been disclosed, the information was nothing the USG would have relied upon. Hence, DCAA cannot establish the fourth element that the USG relied upon the information.

## VII. FIFTH ELEMENT: "The Contract Price was Significantly Impacted"

***SALTS' Position: See the discussion in Section III (information concerning SALTS acquiring DM on the open market does not fall within the definition of cost or pricing data because the information could not reasonably be expected to affect price negotiations significantly.) See also the discussion in Section VI (USG negotiator would not have relied on the undisclosed information).***

According to DCAA, the fifth element of a defective pricing case is that "the contract price was significantly impacted." DCAA Audit Report at 6. *See* the discussion in Section III (information concerning SALTS acquiring DM on the open market did not fall within the definition of cost or pricing data because the information could not reasonably be expecer to affect price negotiations significantly). *See also* the discussion in Section VI (USG negotiator would not have relied on the undisclosed information). Hence, DCAA cannot establish the fifth element—the contract price was significantly impacted.

## CONCLUSION

As shown above, there is no merit to the DCAA's assertion that SALTS has violated its obligation under the Price Reduction for Defective Cost or Pricing Data clause. In particular, SALTS has established that DCAA is confused between (1) the actual exchange rate used in the administration of the SALTS' subcontract with Lechmotoren and (2) the various currency rates that SALTS paid when, from time-to-time, SALTS acquired DMs at its own expense. SALTS had no obligation to disclose the latter to the USG because the information does not fall within the definition of cost or pricing data. Notwithstanding DCAA's confusion, the bottom line is that the actual currency exchange rate used in the administration of Lechmotoren's subcontract was 1 USD ~ 1.5 DM. This actual exchange rate was fully disclosed to the USG prior to SALTS signing the certificate of current cost and pricing data.

To conclude, "[i]t is well established that the Government has the burden of proof on all aspects of a defective pricing claim." American Machine & Foundry Co., ASBCA No. 15037, 74-1 BCA ¶ 10,409. The analysis provide by SALTS establishes that the DCAA Audit Report has not met the Government's burden of proof.

In preparing this response, I relied heavily upon the services of SALTS' attorney, Mr. Jerome S. Gabig. Mr. Gabig lives in the Huntsville area. If you believe it would help expedite the resolution of any further concerns that the USG may have regarding the allegations of defective pricing, I will gladly make Mr. Gabig available to meet with your counsel.

We hope this information will resolve this issue.

Sincerely,

Fahd Al-Hamdan
FMS Program Manager

*Attachments:*

1. SALTS' Memorandum of Negotiation -- Order 0004
2. SALTS letter to Lechmotoren requesting reduction of subcontract price.
3. Acknowledgement of Agreement between SALTS and Lechmotoren.
4. Lechmotoren FFP Proposal dated 8/10/1999.
5. SALTS request to USG to conduct audit of subcontractor.
6. AMSAM-AC-SM-PA letter dated 22 July 2003 regarding content of USG price negotiation memorandum.

01 March 2000

Attachment

MEMORANDUM OF NEGOTIATIONS

Subject: BOA DAAH01-96-C001 NTE Delivery Order 0004

Reference: (A) SALTS FFP Proposal dated 30 November 1999
(B) DCAA Fax of 1/20/2000 from Chris Mahan
(C) SALTS letters of 28 and 29 Feb. 2000 to LECHMOTOREN

Enclosure (1): Negotiation Results by SALTS and USG offers/counter offers and FFP Agreement

1. Negotiations were conducted on the FFP definitization of the subject NTE delivery order commencing on 23 February 2000 and ending with an agreement between the parties on 29 Feb. 2000.

2. Participants: USG (AAMCOM ) Greg Wilson, Contracts Specialist

SALTS: Troy Vesper, Contracts Manager
Ernest Hanks, Financial Specialist
Fahd Al-Hamdan, Program Manager (23 Feb. 2000)

3. Negotiation Issues:

USG: Audit report of SALTS subcontractor LECHMOTOREN by Bundesamt for Wehrtechnik that questioned 25 % of proposal due to DM to $ exchange rate and cost proposed in dollars that were incurred/to be incurred in DM.

SALTS FFP proposal G&A and overhead rates which were above the FPRA rates

SALTS proposed profit of 15.5%

SALTS:

Non-disclosure of LECHMOTOREN audit report findings to SALTS, therefore, having to negotiate without full knowledge of audit recommendations /questioning of subcontractor costs.

Application of FPRA rates to proposal submitted prior to FPRA negotiations

USG proposed limitation on profit of 10% for an order for which SALTS had precommitted resources and funds to

expedite performance at USG request under the NTE order

DISCUSSIONS:

1. The negotiations of reference (A) conducted during the period 23-29 February were detailed and involved discussion of the elements addressed under USG and SALTS issues above (reference (B).
2. The discussions of the LECHMOTOREN proposal and in particular the audit recommended 25% reduction for currency exchange and dollars costs were particularly intense as SALTS needed to communicate with LECHMOTOREN regarding the audit findings relayed to SALTS by the USG.(SALTS not privy to the audit report). Phone calls between Troy Vesper and MS. Jutta Sommers as documented by reference (C).
3. LECHMOTOREN had submitted a proposal in dollars based on an exchange rate of $1/DM1/5 with a contingency that the exchange rate was subject to negotiation on date of contract award. The company had been submitting invoices under the NTE subcontract awarded 14 September 1999 (SALTS NTE order awarded 14 September 1999 also from USG) in DM based on the DM1.5 rate. LECHMOTOREN was extremely reluctant to accept any reduction in the proposed FFP subcontract price of $24,165,813 and debated any audit finding based on the currency fluctuation as the company had initiated performance, purchased long lead time materials in 1999 and set up a production schedule without any contractual commitment from SALTS or the USG. This was done by LECHMOTOREN to ensure prompt delivery of the Generators required by the RSADF. This position was relayed to the USG negotiator during the course of the negotiations. SALTS agreed with the USG to the subcontract costs for LECHMOTOREN of $23,682,497 vice the proposed amount of $24,165,813 even though LECHMOTOREN had not agreed to any reduction and held to the caveat in their proposal of a final negotiation settlement of exchange rate.

4. Regarding the G&A and OH issues, the audit findings (reference B) were discussed also in detail and SALTS emphasized that the proposed rates were submitted prior to the FPRA agreement. Also that the BOA workload projected in the G&A and OH had not been realized as anticipated and had been moved forward in the BOA program to a later date. This affected the loading for CY 1999 and 2000 the period of performance covered by order 0004. Agreement was reached on rates of 17.24 G&A and 9.27 OH.

5. The area of profit was the next issue. The USG had counter proposed 10 % profit to SALTS proposed profit of 15.50% as this was a supply contract where SALTS would purchase largely from a subcontractor.
SALTS stated that the generator were not standard commercial items and required manufacturing effort. The advance action by SALTS and the subcontractor to expedite the delivery of the generators, spares and tools and the requirement to manage, arrange and be responsible for the shipments to the port of embarkation

merited a higher profit. Agreement was reached on a profit of 13.95%.

In summation the negotiation amount of $36,570,187 as the FFP for order 0004 is considered to be a fair and reasonable price for the order.

SALTS has signed a certificate of current cost and pricing data (enclosure 2) dated 29 February which has been provided to the USG.

Troy Vesper

SALTS

الموسسة السعودية للإمدادات والمساندة الفنية
Saudi Logistics and Technical Support

2/5-16/00/447
29 February 2000

Attachment 2

LECHMOTOREN GmbH
Attn: Jutta Sommer
Sudliche Romerstrasse 12-16
D-56972 Altenstadt, Germany
Fax. 49-886-1710-180

Subject: Contract FMS/SC/-99-002 Prime Power, Second Buy

Reference (A): SALTS letter 2/5-16/00/443 of 28 February 2000

Dear Ms. Sommer,

SALTS had advised by reference (A) that the USG contracting officer has set forth in the prime contract FFP negotiations a reduction of $1,208,291.00 in the LECHMOTOREN subcontract FFP proposal. This amount according to the contracting officer was based on costs questioned in the audit report of the LECHMOTOREN proposal. The contracting officer also indicated to SALTS that the amount of $1,208,291.00 (or 5%) was actually less than the total amount of approximately 25% of the subcontract proposal questioned in the audit report.

SALTS pressed the contracting officer for details regarding the questioned amount, however, he stated he was not at liberty to divulge details of the LECHMOTOREN audit report to SALTS as LECHMOTOREN had not authorized the USG to provide audit information to the prime contractor.

SALTS does offer the following, as an observation, in the absence of factual audit information:

While the 25% figure appeared to be severe, the 5% figure, based on SALTS previous negotiations with the USG contracting officer, would most likely represents a reasonable application of judgement by the contracting officer to the audit report recommendations.

SALTS welcomes any additional information you may be able to provide regarding the audit report and the reduction of $1,208,291.00.

Sincerely,

Fahd Al-Hamdan
FMS Program Manager

Kingdom of Saudi Arabia - Sari St. Jarir Bookstore, 2nd Floor - Tel 6391200 - Fax : 6352000 - C.R. 4030072111002 - P. O. Box 2229 Jeddah 21451

SALTS

المؤسسة السعودية للإمدادات و المساندة الفنية

Saudi Logistics and Technical Support

**Attachment 3**

2/5-16/00/592
30 July 2000

Lechmotoren GmbH
Attn: Mr. Thomas Zeller
Südliche Römerstraße 12-16

**Subject: Power Generator Contract -- 2nd Buy. Acknowledgement of Agreement.**

**Reference:**
1. SALTS letter 22/5-16/00/447 dated 29 February 2000.
2. Meeting held between SALTS and Lechmotoren dated 21 July,2000.

Dear Mr. Zeller,

Reference 1. requested Lechmotoren reduce their subcontract value by 5% or $1,208,291 The requested reduction was based on costs questioned in the DCAA audit report of the Lechmotoren proposal. As a result of our discussions in Germany earlier this month (Reference 2.), SALTS acknowledges agreement with Lechmotoren to keep the subcontract value at the proposed $24,165,813. SALTS further acknowledges the following reasons as grounds for keeping the NTE subcontract no. FMS/SC-99-002 price unchanged. However, all terms and conditions remain the same.

Without any firm commitment from the USG or SALTS, Lechmotoren undertook the risk to procure and begin manufacturing generators 6 months prior the contract award.

Lechmotoren disagrees with the DCAA audit findings. (The DCAA audit findings of the Lechmotoren subcontract were not released to SALTS.) Lechmotoren maintained the same prices on the 2nd Buy proposal as with the 1st Buy generator subcontract in 1997. The DCAA at that time accepted the prices as fair and reasonable.

Considering the longstanding relationship between SALTS and Lechmotoren, SALTS agrees to bear the cost difference between the negotiated subcontract costs with the USG and Lechmotoren's subcontract value.

Sincerely,

Engr. Soliman Al-Hajri
Senior Vice President and General Manager

Kingdom of Saudi Arabia - Sari St. Jamjoom Bookstore, 2nd Floor - ☎ 6591000 - Fax : 6392003 - C.R. 4030072117/02 P. O. Box 2229 Jeddah 21451
E-mail:salts@salts-sa.com

AENZINAGGREGATE
DDENSTROM-VERSORGUNGEN
UND FREQUENZUMFORMER
...E UND -GENERATOREN

LECHMOTOREN

TELEFON: 08861/710-0
TELEFAX: 08861/710-180 Verkauf
08861/710-181 Einkauf
E-Mail: LECHMOTOREN@CompuServe.com

GMBH · SÜDLICHE RÖMERSTRASSE 12-16 · D-86972 ALTENSTADT

TV / EDWIE
NARAYAN
FILE
Ric

.T. S.
hd A. Al-Hamdan
Program Manager
Box 2229

AH 21451

00966 2 6938342

RECEIVED
10 AUG 1999
7178

...ks

8/10/1999

ffer No. 5880/02/97/PAT - Firm-Fixed-Price-Proposal

Sir,

ccording to the "Revised Prime Power Statement of Work for Royal Saudi Air Defence orces - PATRIOT (2nd BUY) dated 02 December 1998" and your fax message of Decem-..., 1998, we have the pleasure of submitting our proposal. The prices are based on the ...ed prices, done by the Bundesamt für Wehrtechnik, Koblenz (Contract DAAH01-96-C-001). Since deliveries will only take place in 1999 and 2000 we added 10 % for price increse.

| | Price/unit | Total price/US-$ |
|---|---|---|
| ) 9 EA EPPs III (2 x 150 kW) - 015.05.0017 | | |
| in...ding sea level packing FOB Altenstadt | 858,023.10 $ | 7,722,207.90 $ |
| 2) 2 EA Generators 150 kW 010.04.0062 | | |
| including packaging level A/A FOB Eiselfing | 279,451.72 $ | 558,903.44 $ |
| 3) 13 EA EPUs (2 x 30 kW) 015.05.0018 | | |
| including sea level packing FOB Altenstadt | 535,834.07 $ | 6,965,842.91 $ |
| 4) 4 EA Gen Sets 30 kW 010.04.0074 | | |
| including packaging level A/A FOB Eiselfing | 173,517.21 $ | 694,068.84 $ |

../2

| | | | Price/unit | Total price/US-$ |
|---|---|---|---|---|
| ) | 51 EA Gen Sets 15 kW including packaging level A/A FOB Eiselfing | 010.04.0073 | 141,058.95 $ | 7,194,006.45 $ |
| ) | 1 EPP Power Distribution Unit FOB Eiselfing | 420.02.0208 | 48,470.21 $ | 48,470.21 $ |
| ) | 1 EPU Power Distribution Unit FOB Eiselfing | 420.02.0206 | 31,718.08 $ | 31,718.08 $ |
| ) | 13 EA Power Distribution Assy - US P/N and associated power Cable including packaging level A/A FOB Eiselfing | 11470932 11470942 | 21,178.55 $ | 275,321.15 $ |
| ) | Repair Parts | | | |
| | 6 Sets PLL FU | PCD 13372664 | 8,087.45 $ | 48,524.70 $ |
| | 2 Sets PLL BN | PCD 13372665 | 8,583.88 $ | 17,167.76 $ |
| | 2 Sets ASL | PCD 13372666 | 227,349.83 $ | 454,699.66 $ |
| | including packaging level A/A FOB Eiselfing | | | |
| 10) | Special Tools and Test Equipment (Table 1 of SOW) for | | | |
| | 6 Sets FU | PCD 13372664 | | |
| | 2 Sets BN AQ | PCD 13372669 | | |
| | 2 Sets DS/GS level including packaging level A/A FOB Eiselfing | PCD 13372670 | | 149,788.65 $ |
| 11) | Technical Support | | | |
| | Manmonths in Saudi Arabia, Germany, US | | | 53,000.00 $ per manmonth |

Delivery FOB LECHMOTOREN factory, Altenstadt, for EPPs and EPUs (items 1 & 3), FOB Huber & Sohn, Eiselfing (packaging plant) for the items 2, 4, 5, 6, 7, 8, 9 & 10).

Above-mentioned prices are based on an exchange rate: 1 US-$ = 1.50 DM.

The final exchange rate will be determined on date of contract award.

The offered prices include the incurred costs associated with FOB Altenstadt or FOB Eiselfing, no other taxes and duties or other Governmental levies and/or assessments are considered.

| | |
|---|---|
| ...nent: | as performed for Contract DAAH01-96-C-0001 |
| Warranty: | 12 months after date of signed DD250. |
| Inspection/Acceptance: | performed by the Güteprüfdienst,<br>the inspector will sign a Certificate of Conformity,<br>representing the basis for signing the DD250,<br>or by the SALTS and USG representative. |

The Form DD250 will be signed in Germany by a USG representative.

Our offer is firm, subject to contract award by September 30, 1999. We will undertake all the necessary steps to meet the requested delivery schedule (see our letter of April 16, 1999).

All terms and conditions as applicable to contract DAAH01-96-C-0001.

Please be assured that we will do our utmost to carry out your order to your entire satisfaction.

Yours faithfully,
...HMOTOREN

CONTRACT PRICING PROPOSAL COVER SHEET

NOTE: This form is used in contract actions if submission of cost or pricing data is required. (See FAR 15.804-6(b))

1. NAME AND ADDRESS OF OFFEROR (Include ZIP Code)
LECHMOTOREN GmbH
Südliche Römerstr. 12-16
D-86972 Altenstadt

3A. NAME AND TITLE OF OFFEROR'S POINT OF CONTACT
Thomas Zeller
Jutta Sommer

3B. TELEPHONE NO.
--49/8861/710-100
-101

4. TYPE OF CONTRACT ACTION (Check)
A. NEW CONTRACT | D. LETTER CONTRACT
B. CHANGE ORDER | E. UNPRICED ORDER
C. PRICE REVISION/REDETERMINATION | F. OTHER (Specify)

5. TYPE OF CONTRACT (Check)
[ ] FFP [ ] CPFF [ ] CPIF [ ] CPAF
[ ] FPI [ ] OTHER (Specify)

6. PROPOSED COST (A+B=C)
A. COST: $ 21,968,921
B. PROFIT/FEE: $ 2,196,892.67
C. TOTAL: $ 24,165,813.67

7. PLACE(S) AND PERIOD(S) OF PERFORMANCE
Altenstadt/Germany and Saudi Arabia October 1999 through December 2000

8. List and reference the identification, quantity and total price proposed for each contract line item. A line item cost breakdown supporting this recap is required unless otherwise specified by the Contracting Officer. (Continue on reverse, and then on plain paper, if necessary. Use same headings.)

| A. LINE ITEM NO. | B. IDENTIFICATION | | C. QUANTITY | D. TOTAL PRICE | E. REF. |
|---|---|---|---|---|---|
| 1) | EPPs 13I (2 x 150 kW) | 015.05.0017 | 9 EA | 7,722,207.90 | 5 |
| 2) | Generators 150 kW | 010.04.0062 | 2 EA | 558,903.44 | 5 |
| 3) | EPUs (2 x 30 kW) | 015.05.0018 | 13 EA | 6,965,845.91 | 5 |
| 4) | Gen Sets 30 kW | 010.04.0074 | 4 EA | 694,868.84 | 5 |
| 5) | Gen Sets 15 kW | 010.04.0073 | 51 EA | 7,194,006.45 | 5 |
| 6) | EPP Power Dist. Unit | 420.02.0208 | 1 EA | 48,470.21 | 5 |
| 7) | EPU Power Dist. Unit | 420.02.0206 | 1 EA | 31,718.08 | 5 |
| 8) | Power Dist. Assy | 11470932 | 13 EA | 275,321.15 | 5 |
| | | | | continued | Page 2 |

9. PROVIDE NAME, ADDRESS, AND TELEPHONE NUMBER FOR THE FOLLOWING (If available)
A. CONTRACT ADMINISTRATION OFFICE
B. AUDIT OFFICE
Bundesamt für Wehrtechnik
Konrad-Adenauer-Ufer 2-6
D-56066 Koblenz

10. WILL YOU REQUIRE THE USE OF ANY GOVERNMENT PROPERTY IN THE PERFORMANCE OF THIS WORK? (If "Yes," identify)
[ ] YES [X] NO

11A. DO YOU REQUIRE GOVERNMENT CONTRACT FINANCING TO PERFORM THIS PROPOSED CONTRACT? (If "Yes," complete Item 11B)
[ ] YES [X] NO

11B. TYPE OF FINANCING (X one)
[ ] ADVANCE PAYMENTS [ ] PROGRESS PAYMENTS [ ] GUARANTEED LOANS

12. HAVE YOU BEEN AWARDED ANY CONTRACTS OR SUBCONTRACTS FOR THE SAME OR SIMILAR ITEMS WITHIN THE PAST 3 YEARS? (If "Yes," identify item(s), customer(s) and contract number(s))
[X] YES [ ] NO
SALTS FMS/SC-96-013
DAAK01-92-C-0231 DAAH-01-93-C-0033
DAAK01-94-C-0119 DAAK01-95-C-0174
DAAB-12-96-C-0019 DAAB07-98-D-B266

13. IS THIS PROPOSAL CONSISTENT WITH YOUR ESTABLISHED ESTIMATING AND ACCOUNTING PRACTICES AND PROCEDURES AND FAR PART 31 COST PRINCIPLES? (If "No," explain)
[X] YES [ ] NO

14. COST ACCOUNTING STANDARDS BOARD (CASB) DATA (Public Law 91-379 as amended and FAR PART 30)

A. WILL THIS CONTRACT ACTION BE SUBJECT TO CASB REGULATIONS? (If "No," explain in proposal)
[X] YES [ ] NO

B. HAVE YOU SUBMITTED A CASB DISCLOSURE STATEMENT (CASB DS-1 or 2)? (If "Yes," specify in proposal the office to which submitted and if determined to be adequate)
[ ] YES [X] NO

C. HAVE YOU BEEN NOTIFIED THAT YOU ARE OR MAY BE IN NONCOMPLIANCE WITH YOUR DISCLOSURE STATEMENT OR COST ACCOUNTING STANDARDS? (If "Yes," explain in proposal)
[ ] YES [X] NO

D. IS ANY ASPECT OF THIS PROPOSAL INCONSISTENT WITH YOUR DISCLOSED PRACTICES OR APPLICABLE COST ACCOUNTING STANDARDS? (If "Yes," explain in proposal)
[ ] YES [X] NO

This proposal is submitted in response to the RFP, contract, modification, etc. in Item 2 and reflects our best estimates and/or actual costs as of this date and conforms with the instructions in FAR 15.804-6(b)(1), Table 15-2. By submitting this proposal, the offeror, if selected for negotiation, grants the contracting officer or an authorized representative the right to examine, at any time before award, those books, records, documents and other types of factual information, regardless of form or whether such supporting information is specifically referenced or included in the proposal as the basis for pricing, that will permit an adequate evaluation of the proposed price.

15. NAME AND TITLE (Type)
Thomas Zeller Managing Director

16. NAME OF FIRM
LECHMOTOREN GmbH

17. SIGNATURE
Thomas Zeller

18. DATE OF SUBMISSION
September 17, 1999

NSN 7540-01-142-9845 1411-202

STANDARD FORM 1411 (REV. 2-87)
Prescribed by GSA
FAR (48 CFR) 53.215-2(c)

55-125

27/09 '99 MO 16:03 FAX +49 8261 710180 LECHMOTOREN GmbH ... SALTS JEDDAH 003

September 17, 1999

page 2 to Contract Pricing Proposal Cover Sheet - SALTS .dS / SC-99-002

| | | | | |
|---|---|---|---|---|
| 9) | Repair Parts | | | |
| | PLL FU | PCD 13372664 | 6 Lots | 18,524.70 $ |
| | PLL BN | PCD 13372665 | 2 Lots | 17,167.76 $ |
| | ASL | PCD 13372666 | 2 Lots | 454,699.66 $ |
| | Consumables | PCD 13372673 | 1 Lot | 5,093.92 $ |
| 10) | Special Tools and Test Equipment | | 1 Lot | 149,708.65 $ |
| | Sets FU | PCD 13372664 | 6 EA | |
| | Sets BN HQ | PCD 13372669 | 2 EA | |
| | Sets DS/GS level | PCD 13372670 | 2 Sets | |

LECHMOTOREN GmbH

Thomas Zeller

(Thomas Zeller)

SALTS

المؤسسة السعودية للإمدادات و المساندة الفنية

Saudi Logistics and Technical Support

Attachment 3

PM /TV/ ext/ file

****************** -COMM. JOURN

MODE = TRANSMISSION

NO. COMM. DESTINATION(S)
001 OK ☎ 78012568764043

2/5-12/99/233
28 September 1999

Acquisition Center Commander
U.S. Army Aviation and Missile Command
Attn: AMSAM-AC-SM-PA
Mr. Gregory Wilson
Redstone Arsenal, Al, 35898-5280
Fax. (256) 876-4043

Subject: BOA DAAH01-96-0001 Delivery Order 0004

Enclosure (1): LECHMOTOREN letter with SF1411 dated 9/22/1999
(2): LECHMOTOREN letter FFP proposal dated 8/10/1999
(3): LECHMOTOREN fax. of 7.7.99 Re. consumables

Dear Mr. Wilson,

SALTS is preparing the firm fixed price (ffp) proposal for submittal to the U.S. Government within the 60 day time frame set forth in the subject order. SALTS is compiling current data for the Overhead, and G&A costs to be included in the proposal and is coordinating this information with the DCMC Middle East, Saudi Arabia ACO (Mr. Ronald Moody )for a possible forward pricing rate agreement (fpra).

In order to expedite the negotiation and definitization of the Firm Fixed Price for delivery order 0004, SALTS is requesting that your office coordinate a **subcontract proposal audit** to begin as soon as possible with the **Bundesamt fur Wehrtechnik, Koblenz Germany**. Enclosures (1) through (3) from LECHMOTOREN provide the signed SF1411, firm fixed price proposal and clarification (enclosure (3)) regarding the consumables price included in item 10 of the SF1411. LECHMOTOREN has not provided cost data to SALTS for the proposal but have indicated their records will be available for review by the Bundesamt fur Werktechnik auditors.

Your assistance in requesting the subcontract proposal audit is very much appreciated and will expedite the process for definitization of the firm fixed price order.

If you have any questions, please contact Mr. Troy Vesper at tel. 966-2-639-1000 ext. 409 or E-Mail: salts@anet.net.sa.

Sincerely,

Fahd Al-Hamdan
FMS Program Manager

TV / ERNIE
Narayan
Frank
Ric

NZINAGGREGATE
ENSTROM-VERSORGUNGEN
ND FREQUENZUMFORMER
RE UND -GENERATOREN

LECHMOTOREN

TELEFON: 08861/710-0
TELEFAX: 08861/710-180 Verkauf
08861/710-121 Einkauf
E-Mail: LECHMOTOREN@CompuServe.com

BH · SÜDLICHE RÖMERSTRASSE 12-15 · D-86972 ALTENSTADT

T. S.
d A. Al-Hamdan
Program Manager
ox 2229

H 21451

00966 2 6938342

RECEIVED
10 AUG 1999
7198

ks

8/10/1999

fer No. 5880/02/97/PAT - Firm-Fixed-Price-Proposal

Sir,

ccording to the "Revised Prime Power Statement of Work for Royal Saudi Air Defence s - PATRIOT (2nd BUY) dated 02 December 1998" and your fax message of Decem- 14, 1998, we have the pleasure of submitting our proposal. The prices are based on the udited prices, done by the Bundesamt für Wehrtechnik, Koblenz (Contract DAAH01-96-C-001). Since deliveries will only take place in 1999 and 2000 we added 10 % for price increase.

| | Price/unit | Total price/US-$ |
|---|---|---|
| 1) 9 EA EPPs III (2 x 150 kW) - 015.05.0017 including sea level packing FOB Altenstadt | 858,023.10 $ | 7,722,207.90 $ |
| 2) 2 EA Generators 150 kW 010.04.0062 including packaging level A/A FOB Eiselfing | 279,451.72 $ | 558,903.44 $ |
| 3) 13 EA EPUs (2 x 30 kW) 015.05.0018 including sea level packing FOB Altenstadt | 535,834.07 $ | 6,965,842.91 $ |
| 4) 4 EA Gen Sets 30 kW 010.04.0074 including packaging level A/A FOB Eiselfing | 173,517.21 $ | 694,068.84 $ |

../2

| | | Price/unit | Total price/US-$ |
|---|---|---|---|
| 51 EA Gen Sets 15 kW including packaging level A/A FOB Eiselfing | 010.04.0073 | 141,058.95 $ | 7,194,006.45 $ |
| 1 EPP Power Distribution Unit FOB Eiselfing | 420.02.0208 | 48,470.21 $ | 48,470.21 $ |
| 1 EPU Power Distribution Unit FOB Eiselfing | 420.02.0206 | 31,718.08 $ | 31,718.08 $ |
| 13 EA Power Distribution Assy - US P/N and associated power Cable including packaging level A/A FOB Eiselfing | 11470932 11470942 | 21,178.55 $ | 275,321.15 $ |
| Repair Parts | | | |
| 6 Sets PLL FU | PCD 13372664 | 8,087.45 $ | 48,524.70 $ |
| 2 Sets PLL BN | PCD 13372665 | 8,583.88 $ | 17,167.76 $ |
| 2 Sets ASL | PCD 13372666 | 227,349.83 $ | 454,699.66 $ |
| including packaging level A/A FOB Eiselfing | | | |
| 9) Special Tools and Test Equipment (Table 1 of SOW) for | | | |
| 6 Sets FU | PCD 13372664 | | |
| 2 Sets BN AQ | PCD 13372669 | | |
| 2 Sets DS/GS level including packaging level A/A FO" Eiselfing | PCD 13372670 | | 149,788.65 $ |
| 1) Technical Support | | | |
| Manmonths in Saudi Arabia, Germany, US | | | 55,000.00 $ per manmonth |

Delivery FOB LECHMOTOREN factory, Altenstadt, for EPPs and EPUs (items 1 & 3), FOB Huber & Sohn, Eiselfing (packaging plant) for the items 2, 4, 5, 6, 7, 8, 9 & 10).

Above-mentioned prices are based on an exchange rate: 1 US-$ = 1.50 DM.

The final exchange rate will be determined on date of contract award.

The offered prices include the incurred costs associated with FOB Altenstadt or FOB Eiselfing, no other taxes and duties or other Governmental levies and/or assessments are conside-

CONTRACT PRICING PROPOSAL COVER SHEET

SALTS TMS/SC-99-002

OMB NO. 9000-0013

NOTE: This form is used in contract actions if submission of cost or pricing data is required. (See FAR 15.804-6(b))

1. NAME AND ADDRESS OF OFFEROR (Include ZIP Code)

LECHMOTOREN GmbH
Südliche Römerstr. 12-16
D-86972 Altenstadt

2A. NAME AND TITLE OF OFFEROR'S POINT OF CONTACT

Thomas Zeller
Jutta Sommer

2B. TELEPHONE NO.

++49/8861/710-100
-101

3. TYPE OF CONTRACT ACTION (Check)

| | |
|---|---|
| A. NEW CONTRACT | D. LETTER CONTRACT |
| B. CHANGE ORDER | E. UNPRICED ORDER |
| C. PRICE REVISION/ REDETERMINATION | F. OTHER (Specify) |

5. TYPE OF CONTRACT (Check)

[ ] FFP [ ] CPFF [ ] CPIF [ ] CPAF
[ ] FPI [ ] OTHER (Specify)

6. PROPOSED COST (A+B=C)

| A. COST | B. PROFIT/FEE | C. TOTAL |
|---|---|---|
| $ 21,968,921 | $ 2,196,892.67 | $ 24,165,813.67 |

7. PLACE(S) AND PERIOD(S) OF PERFORMANCE

Altenstadt/Germany and Saudi Arabia October 1999 through December 2000

8. List and reference the identification, quantity and total price proposed for each contract line item. A line item cost breakdown supporting this recap is required unless otherwise specified by the Contracting Officer. (Continue on reverse, and then on plain paper, if necessary. Use same headings.)

| A. LINE ITEM NO. | B. IDENTIFICATION | | C. QUANTITY | D. TOTAL PRICE | E. REF. |
|---|---|---|---|---|---|
| 1) | EPPs III (2 x 150 kW) | 015.05.0017 | 9 EA | 7,722,207.90 | $ |
| 2) | Generators 150 kW | 010.04.0062 | 2 EA | 558,903.44 | $ |
| 3) | EPUs (2 x 30 kW) | 015.05.0018 | 13 EA | 6,965,845.91 | $ |
| 4) | Gen Sets 30 kW | 010.04.0074 | 4 EA | 694,068.84 | $ |
| 5) | Gen Sets 15 kW | 010.04.0073 | 51 EA | 7,194,006.45 | $ |
| 6) | EPP Power Dist. Unit | 420.02.0208 | 1 EA | 48,470.21 | $ |
| 7) | EPU Power Dist. Unit | 420.02.0206 | 1 EA | 31,718.08 | $ |
| 8) | Power Dist. Assy | 11470932 | 13 EA | 275,321.15 | $ |
| | | | | continued | Page 2 |

9. PROVIDE NAME, ADDRESS, AND TELEPHONE NUMBER FOR THE FOLLOWING (If available)

A. CONTRACT ADMINISTRATION OFFICE

B. AUDIT OFFICE

Bundesamt für Wehrtechnik
Konrad-Adenauer-Ufer 2-6
D-56066 Koblenz

10. WILL YOU REQUIRE THE USE OF ANY GOVERNMENT PROPERTY IN THE PERFORMANCE OF THIS WORK? (If "Yes," identify)

[ ] YES [X] NO

11A. DO YOU REQUIRE GOVERNMENT CONTRACT FINANCING TO PERFORM THIS PROPOSED CONTRACT? (If "Yes," complete Item 11B)

[ ] YES [X] NO

11B. TYPE OF FINANCING (✓ one)

[ ] ADVANCE PAYMENTS [ ] PROGRESS PAYMENTS [ ] GUARANTEED LOANS

12. HAVE YOU BEEN AWARDED ANY CONTRACTS OR SUBCONTRACTS FOR THE SAME OR SIMILAR ITEMS WITHIN THE PAST 3 YEARS? (If "Yes," identify item(s), customer(s) and contract number(s))

[X] YES [ ] NO

DAAK01-92-C-0231 SALTS TMS/SC-96-011
DAAK01-94-C-0119 DAAH-01-93-C-0033
DAAB-12-96-C-0019 DAAH01-95-C-0174
DAAB07-98-D-B266

13. IS THIS PROPOSAL CONSISTENT WITH YOUR ESTABLISHED ESTIMATING AND ACCOUNTING PRACTICES AND PROCEDURES AND FAR PART 31 COST PRINCIPLES? (If "No," explain)

[X] YES [ ] NO

14. COST ACCOUNTING STANDARDS BOARD (CASB) DATA (Public Law 91-379 as amended and FAR PART 30)

A. WILL THIS CONTRACT ACTION BE SUBJECT TO CASB REGULATIONS? (If "No," explain in proposal)

[X] YES [ ] NO

B. HAVE YOU SUBMITTED A CASB DISCLOSURE STATEMENT (CASB DS-1 or 2)? (If "Yes," specify in proposal the office to which submitted and if determined to be adequate)

[ ] YES [X] NO

C. HAVE YOU BEEN NOTIFIED THAT YOU ARE OR MAY BE IN NONCOMPLIANCE WITH YOUR DISCLOSURE STATEMENT OR COST ACCOUNTING STANDARDS? (If "Yes," explain in proposal)

[ ] YES [X] NO

D. IS ANY ASPECT OF THIS PROPOSAL INCONSISTENT WITH YOUR DISCLOSED PRACTICES OR APPLICABLE COST ACCOUNTING STANDARDS? (If "Yes," explain in proposal)

[ ] YES [X] NO

This proposal is submitted in response to the RFP, contract, modification, etc. in Item 1 and reflects our best estimates and/or actual costs as of this date and conforms with the instructions in FAR 15.804-6(b)(1), Table 15-2. By submitting this proposal, the offeror, if selected for negotiation, grants the contracting officer or an authorized representative the right to examine, at any time before award, those books, records, documents and other types of factual information, regardless of form or whether such supporting information is specifically referenced or included in the proposal as the basis for pricing, that will permit an adequate evaluation of the proposed price.

15. NAME AND TITLE (Type)

Thomas Zeller Managing Director

16. NAME OF FIRM

LECHMOTOREN GmbH

17. SIGNATURE

Thomas Zeller

18. DATE OF SUBMISSION

September 17, 1999

NSN 7540-01-142-9845 1411-101

STANDARD FORM 1411 (REV. 7-87)
Prescribed by GSA
FAR (48 CFR) 53.215-2(c)

55-123

September 17, 19!9

page 2 to Contract Pricing Proposal Cover Sheet - SALTS Fn5 / SC-99-002

| | | | | |
|---|---|---|---|---|
| 9) | Repair Parts | PCD 13372664 | 6 Lots | 48,524.70 $ |
| | PLL FU | PCD 13372665 | 2 Lots | 17,167.76 $ |
| | PLL BN | PCD 13372666 | 2 Lots | 454,699.66 $ |
| | ASL | PCD 13372673 | 1 Lot | 5,093.92 $ |
| | Consumables | | 1 Lot | 149,788.65 $ |
| 10) | Special Tools and Test Equipment | | | |
| | Sets FU | PCD 13372664 | 6 EA | |
| | Sets BN HQ | PCD 13372669 | 2 EA | |
| | Sets DS/GS level | PCD 13372670 | 2 Sets | |

LECHMOTOREN GmbH

Thomas Zeller

(Thomas Zeller)

**DEPARTMENT OF THE ARMY**
UNITED STATES ARMY AVIATION AND MISSILE COMMAND
5300 MARTIN ROAD
REDSTONE ARSENAL AL 35898-5000

REPLY TO
ATTENTION OF ken weihs

AMSAM-AC-SM-PA

July 22nd 2003

SAUDI LOGISTICS & TECHNICAL SUPPORT COMPANY
P.O. BOX 2229
JEDDAH, 21451
KINGDOM OF SAUDI ARABIA

Attachment 8

Mr. Al-Hamdan,

I apologize for the delay in response to your letter of 04 June 2003. In regard to your request for a 60 day extension, circumstances have granted that. Please provide your findings and resolution of issues by 8 August 2003.

In response to your request for a copy of the audit report of Bundesamt fur Wehrtechnik, I can only provide you with the applicable section. It said:

**2000.1 Supplements**

**The supplements include claims by Lechmotoren which, like the costed profit, are subject to negotiation with the principle contractor. They are only listed in this price audit, as follows:**

| | |
|---|---|
| **Additional profit** | **2% of hundred** |
| **Letter of credit processing** | **1.8% in hundred** |
| **Exchange rate protection** | **7.5% in hundred** |
| **Provision Technical Consulting** | **15% in hundred** |

**This gives a total supplement of 34.74% on the cost line.**

Providing you a copy of the Price Negotiation Memorandum would serve no purpose, because it is silent on the details of the negotiation in regard to the exchange rate. The Pre-Negotiation Memorandum said that based on the above portion of the audit report it would be discussed in negotiations, buy there is no mention of that in the final memorandum.

If you have additional questions, contact Mr. Ken Weihs at AC 256-842-7288 or Email ken.weihs@redstone.army.mil

CHARLES J. JOHNSON
CONTRACTING OFFICER

Printed on Recycled Paper

23-JUL-2003 7:58 FROM SALTS TO 7014655722 P.002