# APPENDIX "3"

**Jerome S. Gabig, Jr.**
*Attorney at Law*

August 25, 2003

Charles J. Johnson
Contracting Officer
Patriot/UAV Acquisition Branch A
U.S. Army Aviation & Missile Command
5300 Martin Road
Redstone Arsenal, AL 35898-5000

**Ref:** Saudi Logistics and Technical Support ("SALTS") Contract No. DAAH01-96-G-0001, D.O. # 0004

Dear Mr. Johnson:

Concerning the allegation by the DCAA of defective pricing in Audit Report No. 2191-2001S42000002, enclosed for your consideration is the declaration of Colonel William E. Borchardt, USAF (Retired).

I would welcome an opportunity to dialog with your counsel on the application of the Truth In Negotiations Act ("TINA") to the facts raised in the DCAA Audit Report.

Sincerely,

/s/

Jerome S. Gabig, Jr.

Encl:

**4811 Cove Creek Drive**
**Brownsboro, AL 35741**
**(256) 479-5303**

| | | |
|---|---|---|
| **Saudi Logistics and Technical Support** | ) | |
| | ) | **DCAA Audit Report No.** |
| **Contract No. DAAH01-96-G-0001** | ) | |
| | ) | **2191-2001S42000002** |
| **D. O. No. 0004** | ) | |

# Declaration Of William E. Borchardt

I, William E. Borchardt, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury that the following is true and correct:

1. I have been retained by Saudi Logistics and Technical Support ("SALTS") to be an expert witness concerning the allegation of defective pricing in DCAA Audit Report No. 2191-2001S43000002. Enclosed is my *curriculum vitae*.

2. In preparing this declaration, I have reviewed DCAA Audit Report No. 2191-2001S43000002. I have also reviewed SALTS response to the July 22, 2003 letter to the contracting officer, Mr. Johnson. I have not reviewed any original documents. Neither have I interviewed any SALTS employees or the DCAA auditor.

3. I have over a quarter of a century of experience in negotiating federal contracts. I spent 25 years in Government contracting serving in contract negotiator, Procuring Contracting Officer (PCO), and Director of Contracting positions. Since my retirement from the Air Force I have worked for a major defense contractor who is the prime contractor on a major weapon system modernization program. I have worked in virtually all levels of acquisition contracting including research & development, test & evaluation, logistics support, and major systems contracting. I have had extensive experience with procurements that fall within the Truth In Negotiations Act. Twenty five of my 28 years

experience has been with the United States Air Force where I either personally negotiated, or been responsible for the negotiation of, thousands of Air Force contracts involving many billions of dollars. Having served as a warranted Government Contracting Officer in many programs and at various levels I am highly qualified to advise on what a prudent buyer would expect to affect price negotiations significantly. More recently, in my current position as the senior manager for a major defense contractor, I have gained considerable experience on what a prudent seller would reasonably expect to affect price negotiations. In my current position I am the senior contracts manager and signatory authority for all major proposals and certificates of current cost and pricing data on government contracts values at over $1 billion.

4. Based on my review of the documents referenced in paragraph 2 above , I believe the question of whether or not there has been defective pricing can be reduced to a single issue: Was "the actual exchange rate data it [SALTS] was incurring in purchasing the foreign currency to pay Lechmotoren" cost or pricing data?

5. Cost or pricing data is defined in the Federal Acquisition Regulation as follows: Cost or pricing data means all facts, that, as of the date of a price agreement or, if applicable, an earlier date agreed upon between the parties that is as close as practicable to the date of agreement on price, prudent buyers and sellers would reasonably expect to affect price negotiations significantly. Cost or pricing data are data requiring certification in accordance with 15.406-2. Cost or pricing data are factual, not judgmental; and are verifiable. While they do not indicate the accuracy of the prospective contractor's judgment about estimated future costs or projections, they do include the data forming the basis for that judgment. Cost or pricing data are more than historical accounting data;

they are all the facts that can reasonably be expected to contribute to the soundness of estimates of future costs and to the validity of determinations of costs already incurred. FAR § 2.101.

6. Concerning the question of defective pricing, the crux of whether the "exchange rate data" was cost or pricing data depends on whether "prudent buyers and sellers would reasonably expect to affect price negotiations significantly." FAR § 2.101.

7. At the outset, it deserves comment that profitability of large corporations which are substantially involved in international business can be significantly impacted by fluctuations in currency rates. To mitigate risks, it is not uncommon for corporations who are contractually obligated to make large payments in foreign currencies to try to protect themselves from currency fluctuations. One such technique is "fence" the funds needed to pay the forthcoming debt and deposit the money in a bank that is local to the foreign vendor. Not only does the deposit earn interest, but also the money can be withdrawn in local currency thus protecting the vendor from possible currency fluctuation.

8. From the audit report and SALTS' draft response to that report, it appears that the procuring agency (U.S. Army Aviation and Missile Command) knew or should have known that the subcontracted portion of SALTS prime contract proposal contained significant uncertainty in regards to what the actual costs SALTS would incur for the power supplies. Specifically:

a. SALTS disclosed to the procuring agency via their prime contract proposal that the ***proposed*** subcontractor costs was based on an NTE proposal from Lechmotoren.. In my experience in Government contracting a proposal of this

magnitude (e.g. over $38 million total, of which $24 million was in subcontractor cost) would receive cost and price analysis as required by FAR 15.404-1(a)(3). Additionally the Government price analyst assisting the PCO would routinely check Government and private indices and exchange rates to test the price reasonableness of major elements of the proposal via analysis and statistical modeling of cost and pricing elements as well as exchange rate data. I noted that the procuring agency did not raise questions about the exchange rates in the proposal when the exchange rates in effect at the time of the proposal and negotiations were higher than what SALTS was proposing. Since both current and historical exchange rate data were available to the procuring agency and they did not identify it as a significant item in the negotiations, it is apparent that the procuring agency was content with the proposed exchange rates and they recognized that the prime contractor would be assuming that risk.

b. Given that the procuring agency was awarding a firm-fixed-price contract where the prime contractor was assuming the risk of both prime contract performance and the currency exchange risk with foreign subcontractors it follows that the procuring agency made only a minor decrement to the proposed subcontract prices based on acknowledgement of the significant risk SALTS was incurring in performing the firm-fixed-price contract.

c. SALTS response to the Contracting Officer's July 22, 2003 is correct that the FAR is structured to shift the risk of currency fluctuation to vendors. To the best of my knowledge, it is customary that vendors who sign certificates of

current cost and pricing data do not disclose information concerning how the vendor uses its private funds to provide a hedge against currency fluctuation.

9. To establish a *prime facie* case of defective pricing, the DCAA Audit Report must explain how the withheld information had a significant impact on cost. The DCAA report attempts to meet this essential element by stating: "In our opinion, negotiated subcontract were overstated by $5,054,953 because SALTS failed to disclose its actual incurred cost data for the Lechmotoren subcontract costs." (DCAA Audit Report at p. 6.) This statement falls acutely short of establishing how the withheld information had a significant impact on cost. Under the present facts, I cannot surmise how this missing element can be established.

10. Parsing the previously quoted statement from the Audit Report, it is insightful to focus on the following portion: "SALTS failed to disclose its actual incurred cost data for the Lechmotoren subcontract costs." In my opinion, the DCAA's conclusion is wrong—SALTS ***did disclose*** what was, in fact, its actual incurred costs data for the Lechmotoren subcontract costs. That data were the CLINs contained in Lechmotoren's FFP proposal dated Aug. 10, 1999 which was provided to the Contracting Officer as an enclosure to SALTS letter of Sept. 28, 1999. (*See* attachment 5 to SALTS letter.) The fact these CLINs were the "actual incurred costs" is evident from reconciling that the definitized subcontract with Lechmotoren was for $24,165,813 and the actual cost to SALTS was $24,165,813 as confirmed by the DCAA Audit Report at page 10.

11. One word, "cost," from the parsed phrase accentuates DCAA's misunderstanding: "SALTS failed to disclose its actual incurred ***cost*** data for the Lechmotoren subcontract

***costs***." (Emphasis added). What costs? SALTS' windfall from speculating on currency exchange rates had nothing to do with the costs that SALTS was contractually obligated to pay Lechmotoren under the subcontract.

12. Stated differently, DCAA has linked SALTS' windfall from speculating on currency rates as a "cost" of the contract. This link simply cannot withstand scrutiny. Because this link fails, I can state with a high degree of confidence that:

a. The exchange rate in which SALTS acquired foreign currencies should not have significantly impacted the contract price if the information had been disclosed to the procuring agency. Accordingly, the assert that exchange rates were cost or pricing data is not consistent with the definition of cost or pricing data in FAR § 2.101.

b. The procuring agency knew, or should have known, from readily available data that the undefinitized SALTS subcontract with Lechmotoren was subject to currency exchange rate fluctuations. The procuring agency placed, and SALTS accepted, maximum risk for contract performance and currency exchange rate fluctuations under the form-fixed-price contract. This insulated the procuring agency from financial exposure while placing the risk of both contract performance and currency rate exchange gains or losses on SALTS.

Executed this 5th day of August 2003.

William E. Borchardt

**WILLIAM E. BORCHARDT**
**3416 Dencrest Court**
**Smyrna, GA 30080**
**(770) 433-1019**

**Relevant Skills:** Business planning and execution; business strategy; teaming arrangements; market research; business communications; government acquisition, business capture strategy, contract proposals, pricing, negotiations and contract administration; general management.

**Employment History:**

Sep 00 – Present Senior Manager, Strategic Airlift Contracts, Lockheed Martin Aeronautics, Marietta GA. Leads all contract proposals, negotiations, and contract administration efforts for C-5 modernization programs, engineering support, modifications, and maintenance of C-141 and C-5 aircraft. Supervises 7 contract and technical professionals managing over $1.5 billion in contractual actions. Senior contract authority for all contractual actions.

Jul 97 – Sep 00 Director of Contracting, Air Force Armament Center, Eglin AFB FL. Led 225+ personnel to provide $2 billion in annual business/contract support. Developed and implemented business strategies for research, development, test, production and modification of weapons systems. Provided all contract support for the free world's largest air base, including engineering and acquisition manpower support. Led business-partnering activities including selling range and test facilities to commercial firms. Approved contracts to $100 million.

Jul 96 - Jun 97 Deputy Director of Contracting, Space and Missile Systems Center, Los Angeles AFB CA. Co-led 300+ personnel providing contract and business support for Air Force space activities, including launch systems and satellite programs (GPS, Space-Based Infrared, Military Satellite Communications, Defense Weather Satellites, etc.). Contracted for all base support and the Aerospace Federally Funded Research and Development Center (FFRDC).

Dec 93 - Jun 96 Chief, Scientific and Technical Contracting Division, Headquarters, Air Force Materiel Command, Wright-Patterson AFB OH. Formulated policy for $2.1 billion science and technology contracting program. Served as focal point for Air Force FFRDCs, Defense Conversion, dual-use technology, and technology transfer. Led Air Force efforts to streamline R&D contracting including grants, cooperative agreements and other transactions; Small Business Innovative Research contracts; Cooperative Research and Development Agreements; and other streamlined R&D agreements. Led joint service development and implementation of the Research and Development Streamlined Solicitation and Contract, which provided a simplified, standard contract for all DOD research under $5 million. Served on and was principle author of a Office of Secretary of Defense directed study of the services' authorization and use of other transactions for research and development (10 U.S.C. 2371) and section "845" other transactions for prototype acquisitions.

Jul 91 – Nov 93 Director of Contracting, Advanced Medium Range Air-to-Air Missile Joint Program Office, Eglin AFB FL. Led 30-person team providing contract and business support for $1 billion annual weapons program. Implemented competitive acquisition strategy to reduce price of missiles 25% annually. Managed DOD's largest "Value Engineering" contracting program to reduce unit cost and share savings with contractors. Initiated patent claims investigation and negotiated a settlement to the largest patent infringement dispute in DOD history.

**WILLIAM E. BORCHARDT**

Jul 89 – Jun 91 Deputy Director of Research, Development, Test and Evaluation Contracts, Eglin AFB FL. Provided contracting and business support to the Air Force Armament Laboratory, the 46th Test Wing, and other Eglin AFB units. Later selected to be Director of Contracting, Air Force Armament Laboratory, Eglin AFB FL. Streamlined contracting and business processes for all out-sourced research (80% of laboratory workload). Led contract efforts to design, manufacture, test, and employ GBU-28 laser guided concrete penetrating bomb within 13 days from go-ahead during war with Iraq.

Jan 88 – Jun 89 Graduate Student, Defense Systems Management College, Ft. Belvoir, VA. Competitively selected for 6-month graduate level course in program management focusing on technical, fiscal, political and management aspects of major systems development and production. Then competitively selected to attend the Army Command & Staff College for 12 months.

Jul 84 - Dec 87 Staff Officer, Headquarters Air Force Systems Command, Andrews AFB MD. Served as a Weapons Systems Contracting Staff Officer; then Chief, Contracting Officer Management Assignments Section; and then Deputy Assistant for Senior Officer Management (assisted four star general in managing command senior officers (colonels and generals)).

Jul 82 - Jun 84 Chief, Night Attack Contracting Group, Electronic Warfare Systems Program Office, Wright-Patterson AFB OH. Contracted for development of electronic warfare systems for strike, reconnaissance, and electronic jamming/anti-jamming systems. Served as contracting officer on the LANTIRN system (terrain avoidance radar, and infrared targeting at night).

Aug 81 - Jun 82 McDonnell Douglas Corporation, St. Louis, MO. Competitively selected for 10-month management intern training with industry. Focus areas included AV-8B aircraft avionics engineering division and the McDonnell Douglas Astronautics fiscal estimating division.

Sep 78 - Jul 81 Contracting Officer, Headquarters Air Force Communications Command, Scott AFB IL. Led team that devised and implemented a program for competitive acquisition of telecommunications services for 90+ Air Force bases. Also contracted for first major computer security risk assessment in the federal government.

Nov 75 - Aug 78 Contracting Officer, and Chief, Services & Construction Branch, Dyess AFB TX. Contracted for base services, supplies, architect and engineering services, and construction.

Jan 73 – Oct 75 University of Alabama and military training. Competitively selected for the Airman's Education and Commissioning Program (scholarship). Completed degree in business administration then sent to Officer Training School and military technical training.

Mar 71 - Dec 72 Enlisted member, U.S. Air Force. Completed six-month electronics school in radar, infrared, and computers, then served as an electronics technician on F-106 interceptor aircraft.

**Education:**
United States Air Force Air War College, 1993
United States Army Command & General Staff College, Ft. Leavenworth, KS, 1989
Department of Defense, Defense Systems Management College, Fort Belvoir, VA, 1988
United States Air Force Air Command & Staff College, 1984
United States Air Force Squadron Officers School, Maxwell AFB AL, 1979
Master's in Management, Webster University, St. Louis MO, 1979
Bachelor of Commerce & Business Administration, University of Alabama, 1974

**Security Clearance:** Top Secret (Special Compartmentalized Information)