# DEFENSE CONTRACT AUDIT AGENCY

# AUDIT REPORT NO. 2191-2001S42000002

September 19, 2002

**PREPARED FOR:** Commander
ATTN: AMSAM-AC-SM-PA/G.Wilson
U.S. Army Aviation and Missile Command
Redstone Arsenal, AL 35898-5280

**PREPARED BY:** European Branch Office
CMR 443, Box 1500
APO AE 09096
Telephone No. (49) 611-380-7509 (DSN 314-338-7509)
FAX No. (49) 611-380-7507 (DSN 314-338-7507)
E-mail Address dcaa-fao2191@dcaa.mil

**SUBJECT:** Report on Postaward Audit of Contract No. DAAH01-96-G-0001/ D.O. No. 0004

**REFERENCE:** ACO: Contract No. DAAH01-96-G-0001/D.O. No. 0004

**CONTRACTOR:** Saudi Logistics and Technical Support
P.O. Box 2229
Jeddah, 21451
Kingdom of Saudi Arabia

**REPORT RELEASE RESTRICTIONS:** See Page 16

**CONTENTS:**


| | Page |
|---|---|
| Subject of Audit | 1 |
| Executive Summary | 1 |
| Scope of Audit | 2 |
| Results of Audit | 2 |
| Contractor Organization and Systems | 14 |
| DCAA Personnel and Report Authorization | 15 |
| Audit Report Distribution and Restrictions | 16 |
| Appendixes | 17 |


FOR OFFICIAL USE ONLY

## SUBJECT OF AUDIT

As part of our continuing program of evaluating contractor compliance with 10 U.S.C. 2306a and implementing regulations, we examined Saudi Logistics and Technical Support's (SALTS) cost or pricing data related to the pricing of Contract No. DAAH01-96-G-0001/D.O. No. 0004. The purpose of the examination was to test whether the price, including profit, negotiated in that pricing action was increased by a significant amount because the contractor furnished cost or pricing data that was not accurate, complete, and current as required by the cited statute.

In its Certificate of Current Cost or Pricing Data, dated February 29, 2000, the contractor certified the data as of February 28, 2000, the date of agreement on price. The firm-fixed-price contract provides for Patriot Prime Power Sets (Buy 2).

The cost or pricing data are the responsibility of the contractor. Our responsibility is to express an opinion on whether the cost or pricing data submitted during the negotiation of Contract No. DAAH01-96-G-0001/D.O. No. 0004 complied with the requirements of 10 U.S.C. 2306a.

## EXCUTIVE SUMMARY

Our examination disclosed that SALTS overstated subcontract costs as a result of failing to disclose the impact of its actual incurred exchange rates on proposed subcontract costs. The audit baseline and recommended adjustment are summarized as follows:

| | |
|---|---|
| Audit Baseline | $38,492,411 |
| Recommended Price Adjustment | $7,379,182 |

SIGNIFICANT ISSUES:

1. SALTS did not provide the most current cost or pricing data in regards to the actual exchange rate data it was incurring in purchasing the foreign currency to pay Lechmotoren (subcontractor), even though this was significantly different from the exchange rate that the proposed subcontract costs were based on. We recommend a subcontract cost adjustment of $5,054,953.

2. The remaining recommended price adjustment of $2,324,229 results from applying overhead, G&A expense, and profit rates to the overstated amount proposed for the Lechmotoren subcontract costs.

3. SALTS does not concur with our recommended price adjustment.

## SCOPE OF AUDIT

We conducted our examination in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the examination to obtain reasonable assurance about whether the data and records reviewed are free of material misstatement. An examination includes:

- evaluating the contractor's internal controls, assessing control risk, and determining the extent of audit testing needed based on the control risk assessment;
- examining, on a test basis, evidence supporting the amounts and disclosures in the data and records evaluated;
- assessing the accounting principles used and significant estimates made by the contractor;
- evaluating the overall data and records presentation; and
- determining the need for technical specialist assistance.

The criteria used to evaluate the cost or pricing data included the public law contained in FAR Subpart 15.4. We have not performed a detailed examination of SALTS' estimating system to ensure that forward pricing proposals and the final certified contract price are based on accurate, complete, and current cost or pricing data. Our audit scope reflects our assessment of control risk and provides a reasonable basis for our opinion.

## RESULTS OF AUDIT

In our opinion, the cost or pricing data submitted by the contractor was not compliant in all material respects with the requirements of 10 U.S.C. 2306a because the data was not accurate, complete, and current as of the date of agreement on price. The negotiated subcontract costs were overstated as a result of SALTS failing to disclose the impact of its actual incurred exchange rates on proposed subcontract costs.

The results of our examination follow:

| | |
|---|---|
| Audit Baseline | $38,492,411 |
| Recommended Price Adjustment | $7,379,182 |

The results of our examination are detailed in the Exhibit beginning on page 4.

The government sustained a loss in the form of interest on overpayment which resulted from the contractor's failure to comply with the Truth in Negotiations Act (10 U.S.C. 2306a). We will provide the interest calculation upon request from the ACO.

ADDITIONAL REMARKS:

We coordinated factual matters relating to our recommendations with Mr. Greg Wilson, Administrative Contracting Officer (ACO), U.S. Army Aviation and Missile Command (AAMCOM). We furnished Mr. Wilson copies of our draft audit findings to ensure that a mutual understanding of the facts and issues was reached.

We discussed the results of our examination with Mr. Ernest Hanks, SALTS Financial Specialist, in an exit conference held on April 25, 2002. In response to our findings, SALTS provided a response, which appears as Appendix 2 (page 18) of this report. Details regarding SALTS' response and our audit rejoinder are incorporated into the explanatory notes of our exhibit. In summary, SALTS does not concur with our recommended subcontract price adjustment.

We request that a representative from our office be provided the opportunity to review and comment on any data received after report issuance that pertains to our report and to assist in resolution of our recommendations.

We also request that the contracting office advise us of the disposition of our audit recommendations, as required by FAR 15.407-1(d).

SAUDI LOGISTICS AND TECHNICAL SUPPORT COMPANY (SALTS)
JEDDAH, SAUDI ARABIA

AUDIT BASELINE AND RECOMMENDED PRICE ADJUSTMENT

CONTRACT NO. DAAH01-96-G-0001, DELIVERY ORDER NO. 0004

| Cost Element | Audit Baseline (Note 1) | Recommended Adjustment | Notes |
|---|---|---|---|
| Subcontract Costs | $24,165,813 | $5,054,953 | 2 |
| ODC | 1,407,059 | | |
| Total Direct Costs | $25,572,872 | $5,054,953 | |
| FMS Overhead | 2,703,465 | 468,594 | 3 |
| Subtotal | $28,276,337 | $5,523,547 | |
| G&A Expense | 5,050,426 | 952,260 | 4 |
| Total Costs | $33,326,763 | $6,475,807 | |
| Profit | 5,165,648 | 903,375 | 5 |
| Total Price | $38,492,411 | $7,379,182 | |

## Explanatory Notes

### 1. Audit Baseline

We used the proposed costs from SALTS' proposal, dated November 30, 1999, as our audit baseline. Although the government negotiated the subcontract cost down to $23,682,497, it was based on a judgmental reduction of two percent and was not based on reductions to any specific cost elements or any more current cost or pricing data submitted by SALTS.

### 2. Subcontract Costs

a. Summary of Conclusions:

We recommend an adjustment of $5,054,953. This is computed by subtracting the negotiated reduction in subcontract costs of $483,316 ($24,165,813 - $23,682,497) from the overstated proposed subcontract costs of $5,538,269 (see Schedule on page 10). As required by FAR 15.403-4, Requiring Cost or Pricing Data, SALTS issued its certification of current cost or pricing data on February 29, 2000, which states the cost or pricing data were accurate, complete, and current as of February 28, 2000. At the time of certification, SALTS did not provide actual incurred exchange rate data relating to the foreign currency purchased to pay Lechmotoren (subcontractor), even though this was significantly different from the rate that had been proposed. The foreign currency data, if provided, would have shown that the cost to SALTS in U.S. Dollars was significantly less than proposed. During negotiations, SALTS failed to disclose



FOR OFFICIAL USE ONLY

the actual exchange rate data and the actual subcontractor cost to the government negotiator. In our opinion, the exchange rate information and the impact that it had on subcontract costs were factual relevant data, and were cost or pricing data. SALTS, therefore, failed to provide the most current, accurate, and complete cost or pricing data to the government at the time of negotiations.

b. Basis of Proposed Cost:

Subcontract costs are based on one subcontractor, Lechmotoren. The Government negotiator relied on a Not-to-Exceed (NTE) proposal for $24,165,813 between Lechmotoren and SALTS dated September 17, 1999. The subcontract proposal was for a fixed price subcontract. In addition, the Federal Republic of Germany's Bundesamt fur Wehrtechnik performed an audit on the subcontractor's proposal. The negotiated price of the subcontract represented a two percent reduction from the NTE price. Terms from the subcontractor's proposal include the following:

- All payments to be made to Lechmotoren under this contract shall be made in U.S. Dollars (USD) or Deutsche Mark (DM).
- Prices are based on an exchange rate 1 USD = 1.50 DM.

c. Audit Evaluation:

The exchange rates SALTS experienced prior to negotiations in its foreign currency transactions ranged from 1 USD = 1.841 DM to 1.93 DM. As stated above, the contractor's proposed subcontract costs were based on using a rate more favorable to SALTS of 1 USD = 1.50 DM. SALTS failed to update the proposed Lechmotoren subcontract cost to reflect the current exchange rates it was experiencing and disclose this to the government at negotiations, as required by FAR 15.403-4.

At the time of negotiations, the contractor did not disclose the exchange rate data that would have put the government on notice of the significant subcontract cost under run. At the time of negotiations, SALTS had received Lechmotoren's invoices totaling 15,589,728 DM or 43 percent of the NTE amount of 36,248,719 DM. Using the proposed exchange rate, the 15,589,728 DM equals $10,393,152. However, using the applicable exchange rates that SALTS was actually experiencing at this time and which were not disclosed, the 15,589,728 DM equaled $8,349,439. The difference of $2,043,713 ($10,393,152 - $8,349,439) can be seen in the schedule to this report starting on page 10. SALTS failed to update the proposed subcontract costs to reflect the current exchange rate at the time of negotiations and the under run it was incurring.

As stated above, the cost impact at the date of negotiations was $2,043,713. We also computed the cost impact for the period from the negotiation date to the end of the contract, which resulted in additional questioned costs of $3,494,556 (see Schedule beginning on page 10). The recommended adjustment of $5,054,953 is computed by subtracting the negotiated reduction in subcontract costs of $483,316 from the $5,538,269 ($2,043,713 + $3,494,556). In our

opinion, negotiated subcontract costs were overstated because SALTS failed to disclose its most current, accurate, and complete cost data related to its actual exchange rates.

To support our recommended subcontract costs adjustment, we address the five elements of defective pricing as follows:

(1) **The Data Meets the Definition of Cost or Pricing Data**

Information that SALTS was experiencing significantly different exchange rates from what the proposed subcontract costs were based on represent cost or pricing data.

(2) **The Data was Reasonably Available**

SALTS was aware of the difference between the exchange rate used to propose subcontract costs and the actual exchange rates SALTS was experiencing prior to negotiations.

(3) **The Data was Not Disclosed**

SALTS did not disclose prior to or at negotiations the actual exchange rates it was experiencing and the impact this had on the proposed subcontract costs.

(4) **The Government Relied on Defective Data**

The ACO relied on SALTS' proposal which included the defective subcontract costs. As discussed in paragraph b on page 5, the subcontract cost was based on an exchange rate of 1 USD = 1.50 DM.

(5) **The Contract Price was Significantly Impacted**

In our opinion, negotiated subcontract costs were overstated by $5,054,953 because SALTS failed to disclose its actual incurred cost data for the Lechmotoren subcontract costs.

d. Contractor's Reaction:

Contractor Comment on the Audit Baseline used:

SALTS disagrees in using the proposed subcontract costs as the audit baseline and not the negotiated subcontract costs. The negotiated reduction to the subcontract was NOT simply "judgmental", but was based on comments by the PCO indicating audit-recommended questioned costs of 25%, which included currency exchange rates applied.

Contractor Comments on Subcontract Costs:

1. SALTS payments to Lechmotoren under the NTE contract and prior to the USG negotiations were not final and were subject to adjustment based on the final negotiations between SALTS and Lechmotoren as the subcontractor proposals submitted over a two-year period during 1997-1999 all stated that the proposed exchange rate of DM 1.5/$1 was subject to negotiation in reaching agreement on the final price. With a remaining 57 percent of the subcontract left to go, it was NOT "apparent to SALTS that there would be a significant under run of subcontract costs." Future currency rates could not be predicted, and an open-ended subcontract left much doubt as to the final subcontract costs.

2. Negotiation data was available and disclosed to the PCO. Besides the NTE Proposal, the PCO had the results of 3 audits to help with his negotiation - 1 German audit on the Subcontract cost (which, in the PCO's words, questioned 25 percent of the subcontractor costs), 1 DCAA audit on the other direct costs and applied indirect rates to all costs, and 1 DCAA audit (FPRA Audit) on the indirect rates. The PCO had more audits at his disposal than any other past negotiation with SALTS. He had much more to rely on than only "an NTE Proposal for $24,165,814". SALTS believes that the currency conversion/fluctuation issues had been identified in the negotiations in the 25 percent government/German agency audit negotiation issues.

3. SALTS did NOT "have knowledge at the time of negotiation that Lechmotoren was going to bill the 36,248,719 DM and not the $24,165,813." SALTS in the negotiations had to be mindful of reaching agreement that would provide adequate funds for SALTS to cover any final settlement with the subcontractor as a result of the subcontractor caveat in Lechmotoren's proposal regarding settlement of a final exchange rate and the currency to be used.

4. Regarding straight-lining the currency rate at 1.93 after the date of negotiation, we feel this is very unreasonable. Due to the very significant volatility of the exchange rates during that time period and to the fact that it was impossible to predict the future exchange rate, SALTS would have never agreed, at that time, to apply a rate of only 1.93 since it would have exposed the Company to very high risk. The risk and volatility of the currency was considered in determining the contract price. No one could have predicted with any certainty whether the exchange rate would have gone against SALTS. The future exchange rate was simply unknown as of the date of negotiation.

SALTS negotiated fully, openly and in good faith in reaching agreement on the negotiated amount, and strongly disagrees with any finding of defective pricing.

e. Auditor's Response:

In regards to SALTS' comments on the audit baseline, we have adjusted the questioned costs to reflect the two percent reduction to negotiated subcontract costs. Regarding SALTS' comments that the ACO (contractor referred to as PCO in their response) indicated the German audit questioned 25 percent of the subcontract costs, the ACO stated that during negotiations it

was discussed that the German audit report cited approximately 25 percent of negotiable areas. The negotiable areas noted in the German audit were general areas and were not based on specific information provided by SALTS.

SALTS' first and third paragraphs in response to subcontract costs discuss how subcontractor negotiations were not completed, the final price was unknown, and SALTS did not know whether the 36,248,719 DM or $24,165,813 was going to be billed. Although subcontractor negotiations were not completed at the time of prime negotiations, SALTS did have knowledge of the subcontract cost under run resulting from the difference between the actual exchange rates experienced and the proposed exchange rates. Supplying this information to the government negotiator would have had a significant impact on negotiated subcontract costs. Also, based on the difference between SALTS' certified proposal and actual incurred subcontract costs and exchange rates at the time of negotiation, there was evidence of a significant under run. Even if SALTS was unsure as to the total billed subcontract costs, SALTS still had an obligation to inform the ACO of the most current cost or pricing data at the time of negotiations. If the most current cost or pricing data were made available, the ACO would have been able to make a more informed decision as to the negotiation of subcontract costs.

Regarding SALTS' second paragraph in response to the 25 percent questioned subcontract costs, as discussed above, the ACO and the German audit referred to this as 25 percent of negotiable areas. The other two audits discussed by SALTS had nothing to do with subcontract costs and, therefore, are not applicable to the questioned costs in this report.

SALTS' response included comments that the volatility of future exchange rates could have resulted in a significant impact on the final subcontract costs. In our opinion, the risk in future exchange rates being volatile was minimized because only six months remained on the contract. Also, the exchange rates in 1999 and early 2000 were stable with the exchange rate at the beginning of 1999 being 1 USD = 1.68 DM and at the time of negotiations in February 2000 the exchange rate making a steady climb to 1 USD = 2.01 DM.

SALTS' response included comments on the fairness of straight lining the 1.93 exchange rate to compute the defective pricing amount for the period after negotiation. It should be noted that the 1.93 exchange rate existed in December 1999 and was not the most current exchange rate at the time of negotiations. As a result, we revised our adjustment using the exchange rate of 2.01 which existed at the time of negotiations. See the Schedule beginning on page 10 for our rationale of using the exchange rate of 1 USD = 2.01 DM.

## 3. <u>Overhead</u>

We found no evidence of defective pricing in relation to the negotiated FMS overhead rate. Our recommended overhead adjustment is due to application of the negotiated FMS overhead rate to the defective base costs. For simplicity, we used one rate for 1999 and 2000. This rate is based on dividing the total negotiated FMS overhead costs of $2,322,287 by the total negotiated direct costs of $25,051,636, or 9.27 percent. The adjustment is computed as follows:

| Description | Amount |
|---|---|
| Defective Base Costs | $5,054,953 |
| Negotiated Combined FMS O/H Rate | 9.27% |
| Defective FMS O/H Costs | $ 468,594 |

4. **G&A Expense**

We found no evidence of defective pricing in relation to the negotiated G&A expense. Our recommended G&A expense adjustment is due to application of the negotiated G&A expense to the defective base costs. For simplicity, we used one rate for 1999 and 2000. This rate is based on dividing the total negotiated G&A expense of $4,719,264 by the total negotiated costs before G&A of $27,373,923, or 17.24 percent. The adjustment is computed as follows:

| Description | Amount |
|---|---|
| Defective Base Costs | $5,523,547 |
| Negotiated Combined G&A Rate | 17.24% |
| Defective G&A Expense | $ 952,260 |

5. **Profit**

We applied the negotiated profit rate of 13.95 percent to the recommended adjustments, as shown below:

| Description | Amount |
|---|---|
| Defective Base Costs | $6,475,807 |
| Negotiated Profit | 13.95% |
| Defective Profit | $ 903,375 |

# COMPARISON OF SALTS CERTIFIED SUBCONTRACT COST WITH ADJUSTED SUBCONTRACT COST USING ACTUAL AND CURRENT EXCHANGE RATES

| Lechmotoren Invoice No. | Subcontractor Invoices in (DM) | $ Amount Using 1.50 Exchange Rate | $ Amount Based On Actual Incurred Exchange Rates | Difference |
|---|---|---|---|---|
| | (a) | (b) | (c) | (d) |
| **SALTS Subcontract Data Prior to Negotiations** | | | | |
| 991081 | DM 1,692,707 | $ 1,128,471 | $ 917,379 | |
| 991080 | 1,041,103 | 694,069 | 563,978 | |
| 991112 | 838,355 | 558,903 | 454,147 | |
| 991066/67 | 98,539 | 65,693 | 53,380 | |
| 991146 | 1,057,942 | 705,295 | 574,543 | |
| 991145/47 | 120,282 | 80,188 | 65,335 | |
| 991182 | 682,050 | 454,700 | 370,478 | |
| 991246 | 1,287,035 | 858,023 | 699,095 | |
| 991245 | 803,751 | 535,834 | 436,584 | |
| 991249/50/51 | 224,683 | 149,789 | 122,044 | |
| 991248 | 1,057,942 | 705,295 | 574,656 | |
| 991247 | 412,982 | 275,321 | 224,325 | |
| 991280 | 1,287,035 | 858,023 | 699,095 | |
| 991281 | 803,751 | 535,834 | 424,860 | |
| 991321 | 1,607,502 | 1,071,668 | 834,026 | |
| 991320 | 2,574,069 | 1,716,046 | 1,335,514 | |
| Subtotal | DM 15,589,728 | $10,393,152 | $8,349,439 | $2,043,713 |

| | Subcontractor Amount in (DM) | $ Amount Using 1.50 Exchange Rate | $ Amount Based On Current Exchange Rate | Difference |
|---|---|---|---|---|
| | (a) | (b) | (c) | (d) |
| **Subcontract Data After Negotiations** | | | | |
| Subtotal | DM 20,658,991 | $13,772,661 | $10,278,105 | $3,494,556 |
| Total Costs | DM 36,248,719 | $24,165,813 | $18,627,544 | $5,538,269 |
| Negotiated Subcontract Reduction (e) | | | | 483,316 |
| Recommended Adjustment (e) | | | | $5,054,953 |

Explanatory Notes

a. The subcontractor, Lechmotoren, invoiced these costs. The 15,589,728 DM represents the amount of costs Lechmotoren invoiced SALTS before negotiations. The remaining 20,658,991 DM represents the amount Lechmotoren invoiced SALTS after negotiations.

b. This column shows the U.S. Dollar equivalents of Lechmotoren costs using the proposed exchanged rate of 1 USD = 1.50 DM. The total from column (a) of 36,248,719 DM equals $24,165,813 using the proposed exchanged rate.

c. The $8,349,439 represents the USD equivalent at the time SALTS paid Lechmotoren for various invoices before negotiations. The $10,278,105 (20,658,991 DM/2.01) represents the USD amount based on the actual exchange rate at the time of negotiations. See Note d. below for an explanation of using this exchange rate to compute the adjustment for the period after prime negotiations.

d. If SALTS had provided current actual incurred exchange rate data, we believe that the amount negotiated in the prime contract for the Lechmotoren subcontract would have been significantly less. To estimate the impact of SALTS not furnishing current, accurate and complete data, we divided the subcontract cost into two phases. The first phase was the portion performed and paid for by SALTS up to the point of negotiations with the government. The second phase is the portion performed after prime contract negotiations.

For the first phase (up to the point of negotiations), 43 percent of the subcontract had been performed and billed to the prime contractor, SALTS. We compared 43 percent of the proposed subcontract value to SALTS' actual incurred cost for the subcontract. This resulted in an adjustment of $2,043,713, as computed above.

For the second phase, we estimated the impact that disclosure of current, accurate, and complete exchange rate data would have had on the subcontract cost after the point of prime negotiations. As of the negotiation date, the remaining period of performance of the subcontract was approximately six months. Our adjustment of $3,494,556 is based on using the current exchange rate at the time of negotiations, 1 USD = 2.01 DM. In our opinion, using the current exchange rate to compute the impact of SALTS not providing actual exchange rate data at the time of negotiation is reasonable based on facts presented below. It should be noted that initially, we used an exchange rate of 1 USD = 1.93 DM to compute our adjustment. However, we revised our position to 1 USD = 2.01 DM based on more accurate information that was available prior to negotiations.

- DCAA normally uses DRI-WEFA to forecast exchange rates. However, we did not use the forecasted exchange rate from DRI-WEFA to compute the phase two impact because we considered it to be outdated. At the time of negotiations, the latest available DRI-WEFA forecast was from the 4th quarter 1999, which was based on economic data from June 1999. As a result, the DRI-WEFA forecast for 2000



FOR OFFICIAL USE ONLY

would not have included economic data for the eight months (July 1999 through February 2000) prior to negotiations. For informational purposes, the exchange rate forecast from DRI-WEFA was 1 USD = 1.683 DM, which is significantly different from the actual exchange rate at the time of negotiations of 1 USD = 2.01 DM.

- The remaining period of performance on the contract was only six months. In our opinion, using DRI-WEFA information that did not include the most recent eight months of economic data to forecast the remaining six months of the contract was not reasonable.

- The proposed exchange rate of 1 USD = 1.50 DM or the DRI-WEFA forecasted rate of 1 USD = 1.683 DM, would have required a drastic devaluation of the USD to be reasonable. For example, the exchange rate would have had to have an average decline from 1 USD = 2.01 DM to 1 USD = 1.00 DM over the next six months to make the proposed rate reasonable. A similar decline would have had to result for the DRI-WEFA rate to be reasonable. It should be noted that we examined more up to date economic data presented by the Congressional Budget Office (CBO). Reports from the CBO from January and February 2000 did not cite any significant changes in the strength of the USD for FY 2000.

- Prior to negotiations, the USD to DM exchange rate was stable with a trend showing the USD getting stronger. With this data, there could have been justification to use a higher exchange rate than 1 USD = 2.01 DM to compute the adjustment. We have summarized the USD to DM exchange rate below starting with January 30, 1999 through the negotiation date of February 28, 2000. It should be noted that after the date of negotiations, the trend continued to 1 USD to 2.30 DM before it declined to 1 USD = 2.15 DM at the end of the contract.



- It should be noted that by the time the DRI-WEFA forecast included all economic data through December 1999 (2nd quarter 2000), DRI-WEFA was forecasting a rate of 1 USD = 1.942 DM for 2000.

e. The recommended subcontract adjustment is based on subtracting the negotiated reduction in subcontract costs of $483,316 ($24,165,813 - $23,682,497) from the overstated proposed subcontract costs of $5,538,269.

## CONTRACTOR ORGANIZATION AND SYSTEMS

1. Organization

SALTS is a sole proprietorship incorporated under the laws of Saudi Arabia. SALTS is engaged in the supply of electronic and electro-mechanical spares, equipment, and repair and return of spare parts. SALTS also provides technical manpower under technical support contracts, configuration management, and English language instructors. SALTS reported annual sales in FY 2000 of $75 million. SALTS employs 73 personnel, of which, 23 work direct on FMS contracts and 23 are indirect FMS employees. The remaining 27 personnel perform work on commercial contracts and within the G&A expense pool.

2. Accounting System

We have not performed a detailed accounting system review of SALTS' accounting system. SALTS has a calendar year accounting period and maintains an accounting system on the accrual basis. Adjusting entries are made at the end of each month and at the end of the year. SALTS prepares financial statements on a semiannual and annual basis. The sole proprietorship is audited biannually by Dr. Al Amri and Company.

SALTS maintains a job order cost accounting system which is fully integrated in the overall accounting system, wherein contract delivery orders are assigned individual job order numbers to which direct costs are identified. The indirect costs are identified with and accumulated under individual departments, which in turn are identified to the various indirect cost pools. The indirect expenses are recorded and billed to projects using ACO provisionally approved rates. SALTS has two indirect cost pools, overhead and G&A. The overhead pool represents the indirect expenses associated with the Patriot Program Office and the Riyadh Computer Center. SALTS maintains separate cost centers and general ledgers for Riyadh and Jeddah operations. The G&A pool relates to costs incurred by SALTS' home office located in Jeddah, Kingdom of Saudi Arabia.

3. Estimating System

We have not performed a detailed estimating system review of SALTS' estimating system. Accordingly, we have assessed control risk as high, as it relates to SALTS' estimating system. We found no estimating deficiencies during this audit.

## DCAA PERSONNEL

| Primary contacts regarding this audit: | Telephone No. |
|---|---|
| Mark Guenther, Senior Auditor | (49) 611-380-7381 (DSN 314-338-7381) |
| Dave Welker, Technical Specialist | (49) 611-380-7515 (DSN 314-338-7515) |
| Arturo Fraga, Supervisory Auditor | (49) 611-380-7509 (DSN 314-338-7509) |
| Other contacts regarding this audit report: | |
| Dan Altemus, Branch Manager | (49) 611-380-7509 (DSN 314-338-7509) |
| Randy Wilks, Procurement Liaison Auditor | (256) 842-9435 |
| | **FAX No.** |
| European Branch Office | (49) 611-380-7507 (DSN 314-338-7507) |
| Procurement Liaison Auditor | (256) 876-3300 |
| | **E-mail Address** |
| | dcaa-fao2191@dcaa.mil |

General information on audit matters is available at http://www.dcaa.mil.

**AUDIT REPORT AUTHORIZED BY:**

*/signed/*
DAN ALTEMUS
Branch Manager
DCAA European Branch Office

## AUDIT REPORT DISTRIBUTION AND RESTRICTIONS

DISTRIBUTION

| | E-mail Address |
|---|---|
| Commander<br>ATTN: AMSAM-AC-SM-PA/G.Wilson<br>U.S. Army Aviation and Missile Command<br>Redstone Arsenal, AL 35898-5280 | greg.wilson@redstone.army.mil |
| US Army Aviation and Missile Command<br>ATTN: AMSMI-AC-BM-A/<br>DCAA PLA Liaison Office<br>Building 5303, Room 3131<br>Redstone Arsenal, AL 35898-5280 | dcaa-pla-amcom@dcaa.mil |
| Saudi Logistics and Technical Support<br>P.O. Box 2229<br>Jeddah, 21451<br>Kingdom of Saudi Arabia<br>(Copy furnished through ACO) | |

RESTRICTIONS

1. Information contained in this audit report may be proprietary. It is not practical to identify during the conduct of the audit those elements of the data which are proprietary. Make proprietary determinations in the event of an external request for access. Consider the restrictions of 18 U.S.C. 1905 before releasing this information to the public.

2. Under the provisions of Title 32, Code of Federal Regulations, Part 290.7(b), DCAA will refer any Freedom of Information Act requests for audit reports received to the cognizant contracting agency for determination as to releasability and a direct response to the requestor.

3. Do not use the information contained in this audit report for purposes other than action on the subject of this audit without first discussing its applicability with the auditor.

# SALTS' WRITTEN RESPONSE

**Guenther, Mark**

| | |
|---|---|
| From: | ehanks [ehanks@salts-sa.com] |
| Sent: | Monday, May 20, 2002 8:12 AM |
| To: | Guenther, Mark |
| Cc: | Soliman Al Hajaj; Troy Vesper; Fahd Al Hamdan |
| Subject: | SALTS response on Audit Report No. 2191-2001S42000002, DAAH01-96-G-0001 Order 0004 |

Mr. Guenther,

Please find below the Company's response to the subject audit report -- for inclusion in the audit report:

Contractor Comment on the Audit Baseline used.
SALTS disagrees in using the proposed subcontract costs as the audit baseline and not the negotiated subcontract costs The negotiated reduction to the subcontract was NOT simply "judgmental", but was based on comments by the PCO indicating audit-recommended questioned costs of 25% - which included currency exchange rates applied.

Contractor Comments on Subcontract Costs.

1). SALTS payments to Lechmotoren under the NTE contract and prior to the USG negotiations were not final and were subject to adjustment based on the final negotiations between SALTS and Lechmotoren as the subcontractor proposals submitted over a two-year period during 1997-1999 all stated that the proposed exchange rate of DM 1.5/$1 was subject to negotiation in reaching agreement on the final price. With a remaining 57% of the subcontract left to go, it was NOT "apparent to SALTS that there would be a significant under run of subcontract costs." Future currency rates could not be predicted, and an open-ended subcontract left much doubt as to the final subcontract costs.

2) Negotiation data was available and disclosed to the PCO. Besides the NTE Proposal, the PCO had the results of 3 audits to help with his negotiation - 1 German audit on the Subcontract cost (which, in the PCO's words, questioned 25% of the subcontractor costs), 1 DCAA audit on the other direct costs and applied indirect rates to all costs, and 1 DCAA audit (FPRA Audit) on the indirect rates. The PCO had more audits at his disposal than any other past negotiation with SALTS. He had much more to rely on than only "an NTE Proposal for $24,165,814". SALTS believes that the currency conversion/fluctuation issues had been identified in the negotiations in the 25% government/German agency audit negotiation issues.

3).SALTS did NOT "have knowledge at the time of negotiation that Lechmotoren was going to bill the 36,248,719 DM and not the $24,165,814." SALTS in the negotiations had to be mindful of reaching agreement that would provide adequate funds for SALTS to cover any final settlement with the subcontractor as a result of the subcontractor caveat in Lechmotoren's proposal regarding settlement of a final exchange rate and the currency to be used.

4) Regarding straight-lining the currency rate at 1.93 after the date of negotiation, we feel this is very unreasonable Due to the very significant volatility of the exchange rates during that time period and to the fact that it was impossible to predict the future exchange rate, SALTS would've never agreed, at that time, to apply a rate of only 1.93 since it would've exposed the Company to very high risk. The risk and volatility of the currency was considered in determining the contract price. No one could have predicted with any certainty whether the exchange rate would've gone against SALTS. The future exchange rate was simply unknown as of the date of negotiation.



FOR OFFICIAL USE ONLY