# In the United States Court of Federal Claims

**No. 08-142C**
**(Filed: February 17, 2009)**

| | |
|---|---|
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* | \* |
| | \* |
| **SAUDI LOGISTICS AND** | \* |
| **TECHNICAL SUPPORT,** | \* |
| | \* **Motion to Dismiss (12(b)(1))** |
| **Plaintiff,** | \* **Government's Counterclaim; Final** |
| | \* **Contracting Officer Decision on** |
| **v.** | \* **Defective Pricing; 41 U.S.C. § 605(a);** |
| | \* **FAR 33.211; Presumption that Public** |
| **THE UNITED STATES,** | \* **Officials Perform Their Duties** |
| | \* **Correctly.** |
| **Defendant.** | \* |
| | \* |
| \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* | |

*Roderic G. Steakley,* Huntsville, AL, for plaintiff. *Jerome S. Gabig, Jr.*, Huntsville, AL, of counsel.

*David S. Silverbrand,* U.S. Department of Justice, Washington, DC, with whom were *George G. Katsas,* Assistant Attorney General, and *Jeanne E. Davidson,* Director, for defendant.

## O P I N I O N

**FIRESTONE**, *Judge.*

This case comes before the court on a motion by the plaintiff, Saudi Logistics and

Technical Support ("plaintiff" or "SALTS") to dismiss the counterclaim brought by the

United States ("government" or "defendant") for lack of jurisdiction pursuant to Rule

12(b)(1) of the Rules of the Court of Federal Claims ("RCFC").  The plaintiff has brought

various claims for relief from a U.S. Army Aviation and Missile Command ("AMCOM")

Contracting Officer's final decision, which found that the plaintiff engaged in defective

pricing and demanded that the plaintiff remit to the government with interest the excess

profits that resulted.  The government's counterclaim is based on the same final decision

and seeks recovery of those profits and accrued interest.  The plaintiff argues that the

decision is not valid under 41 U.S.C. § 605(a) (1997) and applicable federal regulations

and that therefore, the government's counterclaim must be dismissed for lack of

jurisdiction.

For the reasons set forth below, the plaintiff's motion to dismiss the government's

counterclaim is **DENIED**.

I.      **BACKGROUND FACTS**

SALTS is a sole proprietorship organized under the laws of the Kingdom of Saudi

Arabia.  Compl. ¶ 2.  In 1995, SALTS and AMCOM entered into Basic Ordering

Agreement DAAH01-96-G-0001 ("the contract") to supply services in support of the

Royal Saudi Air Defense Forces' PATRIOT missile program.  Id. ¶ 4.  AMCOM issued

an undefinitized contract action Delivery Order 0004 ("the Delivery Order") against the

contract to SALTS on September 14, 1999 for the "fabrication, test[ing], delivery, and

integration of PATRIOT Air Defense System Prime Power Sets in Support of the

Kingdom of Saudi Arabia, Royal Saudi Air Defense Forces."  Def.'s Countercl. ¶ 3.

2

Pursuant to Delivery Order 0004, SALTS agreed to provide the foregoing at a not-to-exceed price, with the final contract price remaining to be negotiated and definitized. Mem. in Support of Mot. Dismiss ("Ptf.'s Mem.") at 1-2.  SALTS immediately began performance at the government's request.  Id. at 2.  The contract was ultimately adjusted to a firm, fixed price, executed on March 29, 2000, and made payable in U.S. dollars ("USD").  Id.  SALTS executed a subcontract with a German company to acquire the generators.  Id.  The subcontract was payable in either USD or German Marks ("DM") at a set ratio of 1 USD to 1.5 DM.  Id.  The subcontractor billed SALTS in DM, and because SALTS had obtained a more favorable exchange rate for DM on the open market than the identified 1 USD to 1.5 DM, SALTS obtained a significant profit from the transaction.

The Defense Contract Audit Agency ("DCAA") conducted a post-award audit, the report of which ("Audit Report") was issued on or about September 19, 2002.  Id. at 2-3. The 18-page Audit Report stated in its Executive Summary:

> Our examination disclosed that SALTS overstated subcontract costs as a result of failing to disclose the impact of its actual incurred exchange rates on proposed subcontract costs. . . .
>
> SALTS did not provide the most current cost or pricing data in regards to the actual exchange rate data it was incurring in purchasing the foreign currency to pay Lechmotoren (subcontractor), even though this was significantly different from the exchange rate that the proposed subcontract costs were based on.  We recommend a subcontract cost adjustment of $5,054,953.

Id. at 3 (quoting Audit Report at 1); App. to Def.'s Resp. to Ptf.'s Mot. Dismiss ("App. to

3

Def.'s Resp.").

The Audit Report included a lengthy section on SALTS's comments on the proposed audit findings, which SALTS had been given in advance of receiving the final report.  The Audit Report noted that for a variety of reasons, SALTS did not concur in the DCAA's conclusion that SALTS had an obligation to disclose its actual exchange rate data to the government.  In the subsection of the Audit Report entitled "Contractor Comments on Subcontract Costs," SALTS stated that it "did NOT have knowledge at the time of negotiation that Lechmotoren was going to bill the 36,248,719 DM and not the $24,165,813.  SALTS . . . had to be mindful of reaching agreement that would provide adequate funds for SALTS to cover any final settlement with the subcontractor."[1]  App. to Def.'s Resp. (Audit Report at 7) (emphasis in original).  SALTS also noted "the very significant volatility of the exchange rates during the time period and . . . the fact that it was impossible to predict the future exchange rate."  Id.

The DCAA responded to SALTS in the Audit Report and explained that although subcontractor negotiations were not complete, "SALTS did have knowledge of the subcontract cost under run resulting from the difference between the actual exchange rates experienced and the proposed exchange rates.  Supplying this information to the government negotiator would have had a significant impact on negotiated subcontract costs."  App. to Def.'s Resp. (Audit Report at 8).  Furthermore, the DCAA noted that

_____

[1]The contents of this subsection are taken verbatim from an email sent from Ernie Hanks of SALTS to Mark Guenther of the DCAA.

4

"[e]ven if SALTS was unsure as to the total billed subcontract costs, SALTS still had an obligation to inform the ACO [("Administrative Contracting Officer")] of the most current cost or pricing data at the time of negotiations." Id. With regard to the volatility of future exchange rates, the DCAA stated in the final report:

> In our opinion, the risk in future exchange rates being volatile was minimized because only six months remained on the contract . . . [,and] exchange rates in 1999 and 2000 were stable with the exchange rate at the beginning of 1999 being 1 USD = 1.68 DM and at the time of negotiations in February 2000 the exchange rate making a steady climb to 1 USD = 2.01 DM.

Id. In a letter dated April 14, 2003, the AMCOM Contracting Officer ("CO") requested that SALTS conduct an evaluation and provide findings and resolutions of the pricing issues identified in the Audit Report. Ptf.'s Mem. at 3. SALTS responded in a ten-page letter with six attachments dated August 6, 2003, in which it set forth various arguments as to why it had not engaged in defective pricing and why, therefore, a price adjustment was not appropriate. Id.; App. 2 to Ptf.'s Mem. In particular, SALTS argued that for reasons similar to those it had asserted before the DCAA, the actual exchange rates it received on DM were not relevant to the SALTS subcontract. SALTS explained that the subcontractor used the contract rate of 1 USD = 1.5 DM to bill SALTS for the subcontract, and thus any exchange rate changes did not affect the contract terms. According to SALTS, the government was not entitled to any benefit SALTS obtained by acquiring DM on the open market because regardless of the value of DM at the time, the contract price to the government remained the same. Moreover, SALTS explained, "[The

contract] placed on SALTS . . . the risk of currency fluctuation." App. 2 to Ptf.'s Mem. at 6. On August 25, 2003, SALTS also provided the CO with the expert declaration of Colonel William E. Borchardt, United States Air Force (Ret.), who offered his opinion as to why SALTS had not engaged in defective pricing. App. 3 to Ptf.'s Mem. Colonel Borchardt stated that under the contract, SALTS bore the risk of exchange rate fluctuations and did not have an obligation to disclose "SALTS'[s] windfall from speculating on currency exchange rates." Id. ¶ 11. Colonel Borchardt stated that the DCAA's attempt to "link[] SALTS'[s] windfall from speculating on currency rates as a 'cost' of the contract. . . . cannot withstand scrutiny." Id. ¶ 12. It is not disputed that the CO did not issue a response to either the SALTS letter or the Borchardt declaration. Ptf.'s Mem. at 5-6.

On March 14, 2007, a new AMCOM CO, Tanya Davis, issued a final decision based on the DCAA Audit, which stated, in pertinent part:

> Reference is made to the U.S. Army Aviation and Missile Command Contract DAAH01-96-G-0001 D.O. 004, which was awarded March 29, 2000, and the Defense Contract Audit Agency Post[-]award Audit Report No. 2191-000002 dated September 19th 2002, Subject: Defective Pricing.

> The post award audit revealed that due to defective pricing, payments were made to you through contract completion. Pursuant to the terms and conditions outlined in the contract, and in accordance with FAR [("Federal Acquisition Regulation")] 32.610[, 48 C.F.R. § 32.610 (2005)],[2] the Government hereby makes a demand for payment of excess profits of $7,379,180 and interest due through March 31, 2007 in the amount of $3,126,896, for a total amount due

---

[2]FAR 32.610 states, in pertinent part, "Unless specifically authorized by agency procedures, contracting officers cannot compromise debts."

of $10,506,076.   Interest charges will accrue, at the approximate rate of
$1,536.56 per day, until paid.

[. . .]

This is the final decision of the Contracting Officer.   You may appeal this
decision to the agency board of contract appeals.  If you decide to appeal, you
must, within 90 days from the date you receive this decision, mail or otherwise
furnish written notice to the agency board of contract appeals and provide a
copy to the Contracting Officer from whose decision the appeal is taken.  The
notice shall indicate that an appeal is intended, reference the decision and
identify the contract by number.  Instead of appealing to the agency board of
contract appeals, you may bring an action directly in the United States Court
of Federal Claims . . . within 12 months of the date you receive this decision.

App. 1 to Ptf.'s Mem.

In response to the CO's final decision document, SALTS sent a six-page letter to

the CO on June 2, 2007, in which SALTS alleged that the final decision was "legally

ineffective" because it "contravene[d] the clear statutory and regulatory instructions for

the content of a final decision."  Ptf.'s Mem. at 7; App. 4 to Ptf.'s Mem.  In the letter,

SALTS requested that the CO "comply with [her] statutory and regulatory obligations by

re-issuing [her] final decision stating the reasons for the decision."  Ptf.'s Mem. at 7.  In

particular, SALTS demanded that the CO respond to its August 2003 submissions.

On June 27, 2007, the DCAA auditor who prepared the Audit Report sent a

lengthy email to SALTS, stating that he "ha[d] been tasked . . . to address the seven

assertions from SALTS's August 6, 2003 letter and the points made by William Borchardt

from August 5 [sic, 25], 2003."  Id. at 8; App. 5 to Ptf.'s Mem.  The email contained

several pages of questions and comments regarding SALTS's objections to the audit

7

findings.  Id.  SALTS replied on July 13, 2007, stating, in pertinent part:

> Thank you for your e-mail of June 27, 2007.  It is clear that you have put a lot of work into your questions/comments.  Although it will take some work on our part, SALTS is prepared to respond to your seven pages.  However, before doing so, it would seem prudent to make sure neither of us is wasting his time.
>
> On March 14, 2007 the Contracting Officer, Tanya Davis, issued a final decision on this matter.  According to the law, "the contracting officer's decision on the claim shall be final and conclusive[. . . .]"  41 U.S.C. § 605(b). In short, because Ms. Davis has already issued a final decision, anything that you do or I do now for Ms. Davis would appear to be a waste of time since her decision is "final and conclusive."
>
> [. . .]
>
> To summarize, if Ms. Davis agrees to rescind her March 14, 2007 final decision, I would be delighted to commit the resources to answer your questions/comments.  However, at this time SALTS is still waiting for a response to its June 2, 2007 letter to Ms. Davis.

Ptf.'s Mem. at 9; App. 6 to Ptf.'s Mem. (emphasis added).

Four days later, on July 17, 2007, the CO sent a letter to SALTS referencing the contract, the Audit Report, the March 14, 2007 letter containing her final decision, and SALTS's June 2, 2007 letter.  Ptf.'s Mem. at 9; App. 7 to Ptf.'s Mem.  The letter stated, "It is the Government's position that the final decision issued by the referenced March 14, 2007 letter[] fully met the requirements of the Contracts Disputes Act, and the Federal Acquisition Regulations, concerning the time for appeal of the Contracting Officer's final decision on this matter."  App. 7 to Ptf.'s Mem.

## II.   PROCEEDINGS TO DATE

On March 7, 2008, the plaintiff filed a complaint challenging the CO's March 14,

2007 decision.  The government filed an answer and counterclaim on June 6, 2008.

Thereafter, the plaintiff filed the pending motion to dismiss the government's

counterclaim.  In its motion to dismiss, the plaintiff argues that the CO's March 14, 2007

decision failed to comply with the requirements for a valid final decision as set forth in 41

U.S.C. § 605(a), which states that the final decision "shall state the reasons for the

decision reached."  In addition, the plaintiff argues that the CO's decision violated  FAR

33.211(a), 48 C.F.R. § 33.211(a) (1995), which states that the CO's decision "shall

include . . . (iii) A statement of the factual areas of agreement and disagreement and (iv) A

statement of the contracting officer's decision, with supporting rationale."  The plaintiff

also charges that the CO's decision did not comport with FAR 4.801, 48 C.F.R. § 4.801

(2005),[3] and 15.407-1, 48 C.F.R. § 15-407.1 (2005).[4]  SALTS claims that the CO was

---

[3]FAR 4.801 states, in pertinent part:

(b) The documentation in the files . . . shall be sufficient to constitute a complete
history of the transaction for the purpose of—
    (1) Providing a complete background as a basis for informed decisions at
    each step in the acquisition process;
    (2) Supporting actions taken;
    (3) Providing information for reviews and investigations; and
    (4) Furnishing essential facts in the event of litigation or congressional
    inquiries.

[4]FAR 15.407-1 states, in pertinent part:

(d) For each advisory audit received based on a postaward review that indicates
defective pricing, the contracting officer shall make a determination as to whether or
not the data submitted were defective and relied upon.  Before making such a
determination, the contracting officer should give the contractor an opportunity to
support the accuracy, completeness, and currency of the data in question.  The

required under FAR 4.801 to respond to SALTS's August 2003 letter and declaration

challenging the DCAA's audit conclusions. SALTS also claims that the decision violated

FAR 15.407-1 because SALTS never received a memorandum documenting the CO's

determination that SALTS is liable to the government for defective cost or pricing data.

The plaintiff contends that in such circumstances, the court must vacate the CO's March

14, 2007 decision and remand the matter to the CO for correction. If the CO's decision is

vacated then there is nothing for SALTS to challenge, and the case must be dismissed.

The government argues in response that the CO's March 14, 2007 decision is a

valid final decision under the applicable CDA and FAR provisions and that therefore this

court has jurisdiction over its counterclaim.

## III.    DISCUSSION

### A.    Standard of Review

In considering a motion under RCFC 12(b)(1) to dismiss for lack of subject matter

jurisdiction, the court is generally "obligated to assume all factual allegations to be true

and to draw all reasonable inferences in plaintiff's favor." Henke v. United States, 60 F.3d

795, 797 (Fed. Cir. 1995) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). In

evaluating a 12(b)(1) motion, the court "may find it necessary to inquire into jurisdictional

---

contracting officer shall prepare a memorandum documenting both the determination
and any corrective action taken as a result. The contracting officer shall send one
copy of this memorandum to the auditor and, if the contract has been assigned for
administration, one copy to the administrative contracting officer (ACO). A copy of
the memorandum or other notice of the contracting officer's determination shall be
provided to the contractor.

facts that are disputed." Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).

"A party seeking the exercise of jurisdiction in its favor has the burden of establishing that

such jurisdiction exists," id., and that party must establish subject matter jurisdiction by a

preponderance of the evidence. Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746,

748 (Fed. Cir. 1988).

**B.      The CO's Decision Complied With the Requirements for a Valid Final
          Decision Under the Contract Disputes Act.**

As noted above, the plaintiff alleges that the government's counterclaim must be

dismissed for lack of jurisdiction on the grounds that the CO's March 14, 2007 decision

does not comply with the requirements of a valid final decision under 41 U.S.C. § 605(a),

which states, in pertinent part:

> All claims by a contractor against the government relating to a contract shall be
> in writing and shall be submitted to the contracting officer for a decision. All
> claims by the government against a contractor relating to a contract shall be the
> subject of a decision by the contracting officer. Each claim by a contractor
> against the government relating to a contract and each claim by the government
> against a contractor relating to a contract shall be submitted within 6 years after
> the accrual of the claim. The preceding sentence does not apply to a claim by
> the government against a contractor that is based on a claim by the contractor
> involving fraud. The contracting officer shall issue his decisions in writing, and
> shall mail or otherwise furnish a copy of the decision to the contractor. The
> decision shall state the reasons for the decision reached, and shall inform the
> contractor of his rights as provided in this chapter. Specific findings of fact are
> not required, but, if made, shall not be binding in any subsequent proceeding.

(Emphasis added).

The key question in deciding whether jurisdiction over the government's

counterclaim exists is whether there has been a final decision by the CO. Sharman Co. v.

11

United States, 2 F.3d 1564, 1569 n.6 (Fed. Cir. 1993) ("The overall statutory scheme contemplates that a contracting party must first obtain a final decision of a contracting officer, and only then may an appeal be taken either to the appropriate board of contract appeals or directly to the Claims Court." (citation omitted)), overruled on other grounds by Reflectone, Inc. v. Dalton, 60 F.3d 1573 (Fed. Cir. 1995). The Federal Circuit has explained that a CO's decision on a government claim is final if it determines both liability and damages. Placeway Constr. Corp. v. United States, 920 F.2d 903, 907 (Fed. Cir. 1990). Based on these Federal Circuit precedents, it is plain that the government has met its burden in establishing jurisdiction in this case under 41 U.S.C. § 605(a).

The CO's decision plainly identifies the basis of the defective pricing claim and by its terms represents the CO's final decision on liability. First, the basis of the government's defective pricing claim is laid out with specificity in the Audit Report, which the CO references in her decision. The defective pricing claim is based on the DCAA's contention that SALTS engaged in defective pricing when it failed to tell the government that it had obtained DM at a much better exchange rate than the rate assumed in the subcontract price of 1 USD = 1.5 DM, which the government had agreed to pay. Second, contrary to SALTS's contentions, the CO had the benefit of SALTS's objections to the defective pricing claim in the Audit Report itself, and therefore she had the benefit of SALTS's views before she issued her decision.

The facts show that SALTS objected to both the draft and final Audit Report with

similar arguments.  In both responses, SALTS argued that it did not have any obligation

to tell the government that it was making a "windfall" on the subject subcontract because

it had obtained DM at an exchange rate that was more favorable than 1 USD = 1.5 DM

identified in the subcontract.  Rather, SALTS claimed that its ability to obtain a better

exchange rate than the rate set in the subcontract was not irrelevant to the government

because under the prime contract, SALTS, not the government, had assumed the risk of

exchange rate fluctuations.  This position was set forth in SALTS's comments to the draft

Audit Report.  In its comments, SALTS stated, "SALTS . . . had to be mindful of reaching

agreement that would provide adequate funds for SALTS to cover any final settlement

with the subcontractor."  App. to Def.'s Resp. (Audit Report at 7).

     While SALTS's submissions subsequent to the DCAA audit build on this

contention, the submissions do not alter SALTS's primary contention before the DCAA.

For example, as stated above, Colonel Borchardt states in his expert declaration on behalf

of SALTS that under its contract with the government, SALTS bore the risk of exchange

rate fluctuations and therefore did not have an obligation to disclose "SALTS'[s] windfall

from speculating on currency exchange rates."  App. 3 to Ptf.'s Mem ¶ 7.  Colonel

Borchardt concludes by stating that in such circumstances, the DCAA could not link

"SALTS'[s] windfall from speculating on currency rates as a 'cost' of the contract."  Id.

Similarly, SALTS's August 6, 2003 letter to the CO states that the contract "placed on

SALTS . . . the risk of currency fluctuation" and that SALTS had no obligation to report

its DM purchases to the government.  App. 2 to Ptf.'s Mem. at 6.

In light of these facts, SALTS's contention that the CO's decision is not valid because the CO failed to provide any reasons for her defective pricing decision is not supported.  Where, as here, the fundamental elements of the dispute between the government and SALTS were laid out in the Audit Report, the CO had the benefit of SALTS's views, and it was therefore not necessary for the CO to respond to the plaintiff's later-refined version of these same arguments in her final decision.  The CO's decision is sufficiently supported by the reasons set forth in the Audit Report.  By referencing the Audit Report as the grounds for the government's claim, the CO provided SALTS with the reasons for her decision.  This, together with the CO's statement informing SALTS that the decision is "final" was more than sufficient to meet the requirements of 41 U.S.C. § 605(a).

### C.      The Contracting Officer's Decision Constituted a Valid Final Decision Under the FAR.

The plaintiff next argues that the CO's failure to address in her March 14, 2007 decision the arguments contained in SALTS's August 2003 letter and the Borchardt declaration violates FAR 33.211(a)(4), which requires that the CO final decision include "(iii) A statement of the factual areas of agreement and disagreement and (iv) A statement of the contracting officer's decision, with supporting rationale," on the grounds that SALTS never received a written statement of the factual areas of agreement and disagreement or a statement of the CO's supporting rationale.  SALTS

14

argues that without this writing, it is impossible to know if the CO considered the contractor's objections to the claim and made an independent determination that the plaintiff's objections lacked merit. SALTS contends that in such circumstances, the decision must be vacated.

While it is no doubt true that the CO did not prepare a decision that meets the plaintiff's standards, it is also true, for the reasons identified above, that the CO's decision in this case is sufficiently supported by the reasoning set forth in the Audit Report to allow this court to assume jurisdiction. The Audit Report provides SALTS with the factual context of the defective pricing dispute and demonstrates that the dispute in this case turns on whether or not SALTS had an obligation to inform the government of the financial benefit it was receiving from fluctuations in the DM exchange rate. There is no dispute regarding the fact that SALTS received a benefit. Indeed, Colonel Borchardt describes the benefit as a "windfall." App. 3 to Ptf.'s Mem. ¶¶ 11, 12. Rather, the dispute turns on whether the contractor was obligated to provide notice to the government of the extent to which the contractor was benefitting from those fluctuations.

The core dispute between the government and SALTS is clearly spelled out in the Audit Report, including the basic positions of the parties. We can therefore presume that the CO determined based on the reasoning of the DCAA, as explained in its Audit Report, which included consideration of SALTS's comments, that the plaintiff engaged

in defective pricing when it paid its subcontactor with DM it had obtained in the open

market at a more favorable exchange rate than that which had been contemplated by the

government in the contract.  Absent evidence to the contrary, the court will assume that,

before issuing her final decision, the CO followed her obligation under the law and put

her own mind to the question of whether, under the facts presented, SALTS had

engaged in defective pricing.  See Pac. Architects & Eng'rs, Inc. v. United States, 491

F.2d 734, 744 (Ct. Cl. 1974) (acknowledging the presumption that a CO puts his or her

own mind to the decision); New York Shipbuilding Co. v. United States, 385 F.2d 427,

435 (Ct. Cl. 1967) (same).

   Moreover, even if the plaintiff were correct and the CO's final decision failed to

fully meet the requirements for a decision under FAR 33.211(a)(4), the plaintiff wrongly

assumes that this would require the court to invalidate and vacate the decision.  While

invalidating or vacating a decision may be appropriate in cases where there is a serious

basis for questioning the propriety of the CO's actions, vacating the CO's final decision

would not be appropriate in this case.  The plaintiff has not presented any evidence to

question the integrity of the CO's actions.  There is no reason to assume that the CO did

not make the final decision based on her own independent review of the DCAA audit.[5]

---

[5]Although this court has invalidated the final decision of a CO where it was found that the
CO's supervisor unduly influenced the decision, the plaintiff has not alleged (and the court does
not find) any such undue influence in this case.  See Lavezzo v. United States, 74 Fed. Cl. 502,
504 (2006) (finding that conflicting final decisions issued by two different COs were "tainted by
the agency's internal discord and the interference of an agency supervisor, who is not a
contracting officer").

Her decision is therefore entitled to a presumption of regularity. <u>Alaska Airlines v. Johnson</u>, 8 F.3d 791, 795 (Fed. Cir. 1993); <u>Haley v. Dep't of the Treasury</u>, 977 F.2d 553, 558 (Fed. Cir. 1992) ("[I]t is well established that there is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations and the burden is on the plaintiff to prove otherwise." (quoting <u>Parsons v. United States</u>, 670 F.2d 164, 166 (Ct. Cl. 1982) (internal quotation marks omitted))); <u>see also</u> <u>Nat'l Archives & Records Admin. v. Favish</u>, 541 U.S. 157, 174 (2004) ("In the absence of clear evidence to the contrary, courts presume that Government agents have properly discharged their official duties." (quoting <u>United States v. Armstrong</u>, 517 U.S. 456, 464 (1996) (internal quotation marks and brackets omitted))).

Where, as here, the CO's final decision lays out the basis for the dispute by referencing the relevant DCAA Audit Report and then asks for payment in accordance with the audit, the CO's decision is adequate for purposes of FAR 33.211 and is sufficient for this court to assume jurisdiction.[6]

## IV.   CONCLUSION

For the foregoing reasons, the plaintiff's motion to dismiss the defendant's

---

[6] The plaintiff's arguments regarding FAR 4.801 and 15.497-1 are also without merit. The CO's failure to provide a specific response to the plaintiff's August 2003 submissions is not relevant to the question of whether this court has jurisdiction over the contracting officer's final decision on the government's claim. The only relevant question for jurisdictional purposes is whether there is a final decision that sets forth the basis for liability and damages. <u>See</u> <u>Sharman</u>, 2 F.3d at 1566; <u>Placeway</u>, 902 F.2d at 907.

counterclaim is hereby **DENIED**.  The parties shall submit a joint status report on or before **Friday, February 27, 2009**, proposing a schedule for the next steps in the litigation.

   **IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

18